### ST. LOUIS & S. F. RY. CO. v. FARR.

(Circuit Court of Appeals, Eighth Circuit. July 10, 1893.)

#### No. 237.

1. COSTS—SUIT IN FORMA PAUPERIS—ARKANSAS STATUTE IN FORCE IN INDIAN TERRITORY—NONRESIDENT PLAINTIFF.

Under Act May 2, 1890, § 31, (26 Stat. 94,) putting in force in the Indian Territory the statutes of Arkansas, and Mansf. Dig. Ark. §§ 1053–1061, providing that every poor person, not being able to sue, may be permitted to bring his action without liability for costs or fees, the privilege of suing in forma pauperis under order of court is granted to every poor person in the jurisdiction of the United States, and not merely to poor persons resident in the Indian Territory.

2. SAME—PRACTICE—MOTION TO DISMISS—TIME OF MAKING.

Under the statutes of Arkansas, extended to the Indian Territory by Act May 2, 1890, § 31, (26 Stat. 94,) allowing poor persons to sue in forma pauperis, under order of court, (Mansf. Dig. Ark. §§ 1053–1061,) and requiring a nonresident plaintiff to file a bond to secure costs, (section 1036,) under penalty of having his action dismissed, (section 1037,) a motion to set aside an order allowing a nonresident to sue in forma pauperis should not be granted, when made on the eve of trial, more than four months after such order was made, and after more than 20 depositions have been taken in the cause.

3. EVIDENCE—EXPERT TESTIMONY—LATENT DEFECT.

In an action for personal injuries caused by a defect in the welding of a brake staff on a freight car, where the broken staff is not produced in

court, and there is no testimony as to its appearance before the accident, but plaintiff introduces evidence as to the appearance of the fracture, tending to prove that the defect would have been discovered by a proper inspection, the opinion of an expert machinist, who examined the fractured parts at the time of the break, as to the possibility of discovering the defect by inspection before the fracture, together with his reasons therefor, is admissible in evidence.

4. DAMAGES — PERSONAL INJURIES — PROXIMATE CAUSE — ABSCESS ONE YEAR AFTER A FALL.

In an action for personal injuries suffered by plaintiff in falling from a freight car, the injuries alleged in the complaint were the crushing of the left leg, necessitating amputation, and bruises on his right hip. Plaintiff testified that his health was good before the accident, and that he recovered and was in good health until nine months after it, when he began to feel a soreness in his right hip, which after three months developed into an abscess. *Held,* that this testimony, on request of defendant, should have been withdrawn from the jury, since there was no evidence or presumption that the abscess was caused by the fall.

5. SAME — MEASURE OF DAMAGES — PROBABLE EARNINGS AND EXPECTATION OF LIFE.

In an action for personal injuries, plaintiff's attorney, in his argument to the jury, said that the life tables proved that plaintiff would probably live 40 years, and that the jury should take plaintiff's yearly earnings, and multiply by 40 to get the correct amount of damages; that, considering the past and future sufferings, this method could work no injustice. *Held,* that the overruling of objections to this argument, as an unfair and misleading one, was reversible error, although the judge charged the jury that if they found for plaintiff they should allow such a sum as would compensate him for past and future loss by reason of his injuries, but that they must consider his power to earn money in new employments.

In Error to the United States Court in the Indian Territory.

At Law. Action by James D. Farr against the St. Louis & San Francisco Railway Company for personal injuries received by plaintiff while in defendant's service. Verdict and judgment were given for plaintiff. Defendant brings error. Reversed.

Statement by SANBORN, Circuit Judge:

On June 20, 1891, James D. Farr, the defendant in error, hereafter called the plaintiff, was thrown from the top of a freight car, and injured, by the breaking of a brake staff with which he was trying to set a brake on a car in one of the trains of the St. Louis & San Francisco Railway Company, the plaintiff in error, hereafter called the defendant. He was a brakeman in the employment of the defendant, and was performing his duty as such when he was injured. The brake staff broke at the point where the staff proper was welded onto that portion of the brake staff known as the "barrel." There was a defect in this welding to such an extent that the staff had only about one-third of the strength of a sound staff of its size. This brake staff was on a freight car owned by the Atchison, Topeka & Santa Fe Railroad Company. This car was passing over defendant's railroad. The plaintiff insisted that a proper inspection would have developed the defect, and have prevented the accident, while the defendant claimed that this defect was latent; that it carefully inspected the car, and did not discover it; and that it could not have been discovered before the accident, by any reasonable inspection. Upon this question the evidence was conflicting. One of the plaintiff's witnesses testified that he examined the ends of the staff after it was broken; that "about one-third of the rod was a fresh break broken right square across, and the rest looked to be an old break. The fresh break seemed to be right square across, and the old break seemed to be slanting;" that the new break seemed to be all together, and the old break seemed to be all

together; and that he did not see any fresh break or shell around the outer surface of the staff. On the other hand, one of the defendant's witnesses, a machinist of 20 years' experience, testified that he saw the ends of the broken staff; that it was broken about one-third of the way across, nearly square, and then broken diagonally up the staff; that the square break was bright, and the diagonal break was of a dull, dead color, except a thin portion around the edge of this break, and that this thin portion was a bright, fresh break; that the portion which was of a dull color was not a fresh break, but a flaw in the iron caused by a defective weld, and that the thin portion around the edge of this defective weld was evidently caused by a perfect swaging of the iron while hot at the time it was welded, and that this swaging would have effectually concealed the defect from the eye. He further testified that when the weld is made in such a staff, even if there is a flaw caused by a piece of dirt or sulphur or some foreign substance getting between the two parts welded, the blacksmith always swages both parts of the iron,—that is, he hammers both portions while they are yet hot with a tool so constructed as to bring the iron to its proper size and form,—and when thus swaged it is impossible to tell by inspection whether the weld extends clear across the iron or not.

There was a verdict and judgment for the plaintiff, and this writ of error was sued out to reverse the judgment.

L. F. Parker, (E. D. Kenna, on the brief,) for plaintiff in error.

George A. Grace, (Thomas S. Osborne, on the brief,) for defendant in error.

Before SANBORN, Circuit Judge, and SHIRAS and THAYER, District Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

1. A nonresident of the Indian Territory, who has a cause of action for a personal injury, but has not the means to sue, may be permitted to sue, or to prosecute an action already commenced, in forma pauperis, in the United States court in that Territory, and he is not required to give security for costs under the laws there in force. Sections 1053 to 1061, inclusive, of Mansfield's Digest of the Laws of Arkansas, provide that every poor person not able to sue, and having such a cause of action as that set forth in the complaint in this case, may, by order of the court, be permitted to bring or prosecute his action without liability to his attorney, or to the officers of the court, for costs or fees. Section 1036 of Mansfield's Digest provides that a plaintiff who is a nonresident of the state of Arkansas shall file a bond to secure the costs of the action, and section 1037 provides that:

"An action in which a bond for costs is required by the last section, and has not been given, shall be dismissed on the motion of the defendant at any time before judgment unless in a reasonable time to be allowed by the court after the motion is made therefor the bond is filed securing all past and future costs; and the action shall not be dismissed or abated if a bond for costs is given in such time as the court may allow."

By the act of congress of May 2, 1890, (26 Stat. 94, c. 182, § 31,) these provisions of the statutes of Arkansas were extended over, and put in force in, the Indian Territory. This action was commenced July 23, 1891. The plaintiff filed a petition in the court below for leave to sue as a poor person, September 2, 1891. This

petition was granted, and the defendant was allowed to file its answer by an order of the court made September 3, 1891. The answer was filed on that day. The action was continued over the term September 24, 1891. The defendant moved to set aside the order allowing the plaintiff to sue as a poor person, January 26, 1892. That motion was denied February 8, 1892, and this denial is the first error assigned.

The defendant has no valid ground of complaint here, for two reasons:

First. The act of congress which put the Arkansas statutes in force in the Indian Territory provided, in effect, that the court below might permit any poor person who was unable to pay the costs of a suit to prosecute it in forma pauperis. It will not do to say that this statute applies only to residents of the Indian Territory, because the statute itself declares that "every poor person" shall have this privilege, and because congress, which was legislating for the entire nation, must be presumed to have granted this privilege to all the poor persons within its jurisdiction; that is to say, to all within the United States. Heckman v. Mackey, 32 Fed. Rep. 574; Miller's Adm'r v. Norfolk & W. R. Co., 47 Fed. Rep. 264, 267.

Second. The motion came too late. The order allowing the plaintiff to sue as a poor person was made in September, 1891. In that month the action was continued. In January, 1892, after more than 20 depositions had been taken, and after more than four months had elapsed since the original order was made, and when the trial was imminent, the defendant, for the first time, moved to set aside this order. This unexplained delay, after full notice of the nonresidence of the plaintiff, which was given by the complaint, was a waiver of any right the defendant had in this matter. The fair construction of the statutes of Arkansas we have referred to is that the action of the nonresident who will not give security for costs must be dismissed unless he is a poor person, unable to pay them. When he is adjudged to be such a poor person, the statute provides that the court shall appoint his attorney, who must serve without compensation. It would be a manifest injustice to permit the defendant to impose upon the plaintiff's attorney all the labor of preparing for a trial, where so many depositions were taken, only to dismiss the case on the eve of the trial on a ground of which it must have been aware when the original order was made. Wallace v. Collins, 5 Ark. 41, 47; Swift v. Stine, (Wash.) 19 Pac. Rep. 63.

2. Where the question is whether or not a defective weld of an iron staff, which caused its break, could be discovered by inspection before it broke, a competent expert, who saw one of the broken pieces, may testify to the appearance of the broken end, and give his opinion upon the question. J. A. Headrick was a machinist of 20 years' experience. He examined one end of the broken staff immediately after the accident. He testified that the break was caused by a defective weld; that the most natural cause for this defect would be that some dirt or coal or sulphur got between the

two parts, and prevented the fiber of one piece of the iron from joining perfectly with that of the other, and that in his opinion this was the cause of the defect in this staff; that such a defect as this can exist in any brake staff, or any other weld, without any indication on the surface of the iron of any weakness or defect therein; that he could see on this staff where the weld was perfect, and where it was defective, as he saw it but a short time after it was broken. Then followed, in his deposition, the following statement, which was stricken out by the court on the plaintiff's motion:

"And in my judgment such a defect as this could not have been discovered by inspection, *as the iron had been well swaged; that is to say, the outside of the iron appeared smooth, and would indicate that the weld was perfect before it was broken.*"

That portion of this statement which appears in italics was confined to a description of the appearance of the broken staff, and was proper evidence for the jury to consider in deciding the main question, whether or not a proper inspection would have brought the defect to light. The broken staff was not produced. No witness who examined it before it broke testified to its appearance then. The plaintiff's witnesses had properly testified to the appearance of the broken ends after the accident, and such testimony seems to have been the best the case permitted. Indeed, in the absence of eyewitnesses of the staff before the break, what could be more pertinent or persuasive to determine what the eye could then have seen than the description of that which the eye did see immediately after the break? Nothing, unless the opinion of an experienced man, skilled in the art of welding, would have been; and this brings us to a consideration of the first part of the rejected sentence, where this machinist expressed his opinion that the defect could not have been discovered before the break. The jury cannot be presumed to have been machinists or blacksmiths. We cannot suppose that they were familiar with the process of swaging, or its effect upon the appearance of an iron rod defectively welded. This was not a matter of common knowledge. It seems plain that the jury would not have been as competent as this experienced machinist to decide whether or not this defect could have been seen before the break, if they had examined the broken staff. They were wanting in the knowledge, skill, and experience that best fits men to determine this question,—the knowledge, skill, and experience that this witness had,—that of the machinist familiar with the process of welding, and its defects and dangers, patent and latent.

In 2 Tayl. Ev. § 1275, the law is thus stated:

"It may be laid down as a general rule that the opinion of a witness possessing peculiar skill is admissible whenever the subject-matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it without such assistance."

The opinion of this witness came fairly within this rule, and it should have been received. Krippner v. Biebl, 28 Minn. 140, 142, 9 N. W. Rep. 671; Davidson v. Railway Co., 34 Minn. 51, 55, 24 N. W. Rep. 324; Railroad Co. v. Huntley, 38 Mich. 537.

3. The damages recoverable for an injury are limited to its natural and probable consequences.    There is no presumption that a personal injury, from which one recovers so as to enjoy good health, is the cause of an abscess, to which men who have never been injured are frequently subject, simply because that abscess makes its first appearance subsequent to the injury.    Before a recovery can be permitted for such an abscess, convincing proof must be adduced that the injury was its proximate cause.    There is no presumption that an abscess on the right hip, which first "hurt" nine months after, and which formed a year after, one received a fall that bruised his right hip and side, and necessitated the amputation of his left leg, was the result of that fall, where the victim of the injury recovered, and enjoyed moderately good health after his fall, and before the abscess began to gather.    The plaintiff in this case was injured June 20, 1891.    He testified that his health was as good as any one's before the accident; that after the accident his health was tolerably good, until he had a sort of sickness, in June, 1892; that he had a "kind of hurting in his right hip for two or three months, and then [in June, 1892] an abscess formed in his side, and he had to have an operation performed;" and that the operation cost him $160.    He further testified that when he fell, in June, 1891, he was bruised on his right side and on his left side, on his right shoulder and on his right hip.    The testimony concerning the abscess was objected to when introduced, and at the close of the trial the court was requested to withdraw it from the consideration of the jury, on the ground that there was no evidence tending to show that it resulted from the injury sued for.    No mention of this abscess was made in the complaint.    The injuries there alleged were the crushing of the left leg, necessitating amputation, the bruises from the fall, and the consequent suffering.    No witness testified that this abscess was caused, or that it might have been caused, by the fall of the year before, while the testimony of the plaintiff that "he had some kind of a hurting in his hip for two or three months, and then the abscess formed," is very persuasive proof that he had no soreness there for months prior to the gathering of the abscess.    It tends strongly to show that his bruises had long been healed before this hurting commenced.    It is common knowledge that boils, carbuncles, and abscesses are not generally caused by bruises, falls, or the amputation of limbs.    Bruises generally heal without these tormentors; abscesses generally form without antecedent bruises; hence, in the absence of any evidence that an abscess was caused by a bruise or a fall, it can no more be said to be the natural or probable consequence thereof than could a fever, the diphtheria, pneumonia, or any other disease to which the injured and the uninjured are alike liable.    As there was no evidence that the injury complained of here was the cause of the abscess, and no presumption to that effect, the evidence concerning it should not have been submitted to the jury.

4. The plaintiff's attorney, in his closing argument to the jury, told them that the life tables proved that the plaintiff would prob-

ably live 40 years; that in that time, at $15 a month, he would earn $7,200; at $70 a month, $33,600; at $50 a month, $24,000; at $40 a month, $19,200; and then he added:

"Now, gentlemen, any one of these figures are sustained by the evidence. It can not be simply guesswork. And then you take into consideration his sufferings; what he has suffered, and what he will hereafter suffer. You cannot be doing an injustice. You will find what amount he could earn in a month, and then multiply that by twelve, and that by forty, and then you get the correct amount of the damages."

To these remarks the defendant objected on the ground that this was an incorrect method of arriving at the measure of damages, and that the remarks were unfair, and tended to mislead the jury. The court overruled the objection, and remarked, "That is a fair argument." This was a manifest error. The present value of the earnings of 40 years to come, if absolutely assured, is much less than 50 per cent. of their amount, at any rate of interest that prevails in the Indian Territory; and when it is considered how uncertain these earnings are, how many chances of disability, disease, and disposition condition the probable earnings of a young man, the rule announced is absurd. Nor was the vice of this argument, or of the court's approval of it, anywhere extracted in the general charge. The judge contented himself with the harmless remark, upon this branch of the case, that if the jury found for the plaintiff they should allow such a sum as would compensate him for his pecuniary loss sustained, or that he would hereafter sustain, by reason of the disabilities caused by his injuries, but that they should not assume that he was entirely incapacitated because he could not perform the duties of a brakeman, but should consider his power to earn money in other stations in life. He nowhere condemned the vicious and misleading rule for measuring the plaintiff's pecuniary loss which the plaintiff's attorney had laid down, and he had approved. We repeat here what we had occasion to say in Railway Co. v. Needham, 52 Fed. Rep. 371, 377, 3 C. C. A. 129:

"General remarks of this character in the course of a charge, while they may tend to show that the court really entertains sound views of the law, do not extract the vice of an erroneous instruction, positive in its terms, which directs the jury to allow damages on a wrong basis."

Nor do these remarks of the attorney constitute a fair argument. The jury is sworn to determine the issues of the case according to the law and the evidence given them in court, and no argument is fair which misstates the evidence, or misleads the jury as to the law.

The judgment is reversed, and the cause remanded, with instructions to grant a new trial.