ALABAMA G. S. R. CO. v. CARROLL.

(Circuit Court of Appeals, Fifth Circuit.   January 3, 1898.)

No. 516.

**1. APPEAL—REVIEW—RECONSIDERATION OF QUESTION ON SECOND APPEAL.**
   A question which has been settled by the decision of an appellate court will not be again considered by such court in the same suit.

**2. JURISDICTION OF FEDERAL COURT—CITIZENSHIP—EVIDENCE.**
   Where the evidence is sufficient to support a finding that a plaintiff left the state of his residence, where the action was brought and the defendant is domiciled, without intention to permanently change his domicile, a federal court is justified in taking the case from the jury, and directing its dismissal, as one not properly within its jurisdiction.

**8. DAMAGES — ACTION FOR PERSONAL INJURIES — EVIDENCE OF POVERTY OF PLAINTIFF.**
   In an action for personal injuries, evidence of the poverty of plaintiff and his relatives is irrelevant, and its admission is error.

**4. SAME—MEASURE FOR LOSS OF EARNINGS.**
   The measure of damages for an injury depriving a plaintiff of his earning power is not the amount he might probably earn during his expectancy of life, but the present value of such earnings.

**5. TRIAL—ARGUMENT OF COUNSEL.**
   It is error to permit counsel, over objection, to state in argument an erroneous rule of damages, or to introduce into his argument matters outside the evidence, and having a tendency to mislead the jury as to the true measure of damages, and to allow the same to go to the jury without correction.

**6. MASTER AND SERVANT—INJURY TO EMPLOYE—RAILROADS.**
   Where plaintiff, a brakeman, had access to the rules of the company relating to his employment, he was chargeable with notice of their requirements; and when such rules were reasonable, and they required plaintiff to inspect the links and drawheads of the cars making up the train on which he was employed, and he failed to do so, he cannot recover for an injury resulting from a defective link.   If the defect was discoverable by a proper inspection, he was guilty of contributory negligence, and, if not, it was an assumed risk of his employment.   Per Pardee, Circuit Judge.

**7. SAME—RAILROADS—INSPECTION OF CARS.**
   While it is the duty of a railroad company to cause inspection of its cars, and also those of other companies handled on its road, it is not held to the same measure of thoroughness in the inspection of foreign cars received for through transit over its lines as in case of its own cars, the care required being determined by what is reasonable under the circumstances.

   McCormick, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Alabama.

This was an action by William D. Carroll against the Alabama Great Southern Railroad Company to recover for personal injuries sustained as an employé.   There was judgment for plaintiff, and defendant brings error.

George Hoadley, Jr., A. G. Smith, and James Weatherby, for plaintiff in error.

Richard L. Brooks and S. W. John, for defendant in error.

Before PARDEE, and McCORMICK, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge.   The defendant in error in this case was a brakeman on the railroad of plaintiff in error, working on the freight trains of said railroad between Birmingham, Ala., and Meridian, Miss.   The contract of employment was made in the state of Alabama, and he started to work, when he commenced, in the state of Alabama, and was to work between Birmingham, Ala., and Meridian, Miss.   On the night of the 18th of June, 1890, he started out as a brakeman on a train from Birmingham, Ala., to Meridian, Miss.   He was asleep in the caboose of the train in Birmingham before he started, and was aroused a few minutes before the train was to start.   He got up and went to the train, and just before it started, in company with the conductor and his fellow brakeman, he made a casual inspection of the train, but none of the three inspected the links coupling the cars before starting.   The train stopped at Tannehill, Ala., to get water, and stayed there about five minutes; at Woodstock, Ala., to meet another train, and stayed there about five minutes; at Tuscaloosa, to put out a car, and stayed there some ten or fifteen minutes; at Carthage, Ala., and stayed there about five minutes; at Miller's Tank, Ala., and stayed there about five minutes; at Eutaw, Ala., and stayed there several minutes; at Epp's Station, Ala., and stayed there several minutes, taking on coal, etc.; at York Station, Ala., and stayed there several minutes.   At none of these stops did the defendant in error or his fellow employés make any examination of the links or couplings of the train.   At Miller's the testimony showed that when the train stopped it was on a trestle, and they could not have made the examination.   At all other places there was no physical reason why the examination could not have been made.   Between Birmingham and Meridian there are several very heavy grades, one of them being at or near Wallace's Station, in the state of Mississippi.   After the train had passed over the steep grade near Wallace's Station, and while it was on nearly level track, in the state of Mississippi, the train parted.   At the time the train parted the defendant in error was on top of the cars, putting on the brakes.   He had put on several, and was trotting on top of the cars, and was about to step from one car to another, when the train parted between the cars over which he was at the time passing, and he fell down in between the cars, and was run over by the rear section, and had one foot and a part of the other cut off.

The evidence shows that the two cars that separated were cars A. G. S., No. 9,341, and C., H. & D., No. 8,225.   The A. G. S. car was a car of the Alabama Great Southern Railroad Company, and the C., H. & D. car was a foreign car, belonging to the Cincinnati, Hamilton & Dayton Railroad Company.   The car C., H. & D. was received by the Alabama Great Southern Railroad Company at Chattanooga from some foreign road.   At Chattanooga it was put in train, as a through car, and an A. G. S. car came from Chattanooga with it, a car being coupled between them.   At Birmingham the intervening car was cut out, and the A. G. S. car and the C., H. & D. car were linked together, with the link that came with the C., H. & D. car from some foreign road, and this was the link that broke in two and caused the accident.

The train had 24 cars in it, and the link broke between the sixth and seventh car from the caboose, or hind car.

The evidence showed that the link belonged to the Kentucky Central Railroad; that the Alabama Great Southern Railroad Company had provided inspectors, whose duty it was to examine all trains going out, before they left, to see that all links, both foreign and domestic, about them were in proper order; that these inspectors were stationed at Chattanooga, Tenn., Attalla, Ala., Birmingham, Ala., Rising Fawn, Ga., Woodstock, Ala., and Tuscaloosa Ala.; that the Kentucky Central Railroad Company, which owned the link, purchased their links from manufacturers of the best reputation, and that the Alabama Great Southern Railroad did the same thing. There was evidence tending to show that the link which broke, which showed also a bend, was bent cold, and that iron bent cold lost some of its strength. There was evidence tending to show that the link was bent before the accident. The iron of which the link was made was a good quality of iron. There was evidence tending to show that the link was cracked before it came in two, but the evidence did not show how long it had been cracked before it broke, if it was cracked at all. There was no evidence to show that the link was defective before it was put in the train to couple the cars, other than that it might have been bent cold. The train to which the accident happened was amply supplied by the railroad company with extra links, of different kinds, to be used by the trainmen in replacing defective or broken links.

The following rules of the Alabama Great Southern Railroad Company were offered in evidence:

"Rule 126. All persons entering or remaining in the service of the company are warned that, in accepting or retaining employment, they must assume the ordinary risks attending it. Each employé is expected and required to look after and be responsible for his own safety, as well as to exercise the utmost caution to avoid injury to his fellows, especially in the switching of cars and in all movements of trains. Stepping on the front of approaching engines, jumping on or off trains or engines moving at a high rate of speed, getting between cars while in motion to uncouple them, and all similar imprudences, are dangerous and in violation of duty. Employés of every grade are warned to see for themselves that the machinery or tools which they are expected to use are in proper condition for the service required, and, if not, to put them in proper condition, or see that they are so put before using them. The company does not wish or expect its employés to incur any risks whatever from which, by exercise of their own judgment and by personal care, they can protect themselves, but enjoins them to take time in all cases to do their duty in safety, whether they may, at the time, be acting under orders of their superiors or otherwise."

"Rule 242. They are charged with the management of the brakes, and the proper display and use of train signals. They must examine and know for themselves that the cars, brakes, ladders, running boards, steps, coupling gear, and all appliances, which they are to use, are in proper condition, and, if not, put them so, or report them to the proper parties, and have them put in order before using."

"Rule 245. They must assist in loading and unloading freight, and aid the conductor in inspecting the cars, when the train stops for water or for other trains."

It was shown that a copy of the printed rules. of the company, from which the foregoing were extracted, was in the caboose of the train for the use of employés; and Carroll admitted that at a for-

mer time during his employment he had had a copy of the book in his possession, and had examined the same as far as the rules related to signals, but denied examining it further. Upon trial the jury rendered a verdict in favor of the plaintiff below, defendant in error here, in the sum of $15,000, upon which verdict the court gave judgment against the defendant below, the Alabama Great Southern Railroad Company, which company sued out this writ of error.

The record is voluminous. It contains 182 distinct assignments of error, appropriating 50 pages of the printed record, showing a very wide divergence of opinion on questions of pure law between the learned judge presiding in the circuit court and the learned counsel representing the railroad company; for, certainly, counsel would not have taken the trouble to reserve exceptions in the trial court, and elaborate them into assignments of error in this court, unless they firmly believed in the correctness of their own opinions, and deemed it their duty to thus make up the record in order to protect the interests of their client. This court has had occasion to criticise the multiplication of exceptions and assignments of error, and we call the attention of counsel to what has been said on the subject. Howison v. Iron Co., 30 U. S. App. 473, 497, 17 C. C. A. 350, and 70 Fed. 683; Steiner's Ex'rs v. Eppinger, 23 U. S. App. 344, 9 C. C. A. 484, and 61 Fed. 253.

Without undertaking to deal with all the assignments of error, we will consider the important ones from our own standpoint.

It is complained that the trial court erred in sustaining the demurrer of the defendant in error to the rejoinder of the plaintiff in error, which rejoinder was in reply to a replication of the fourth plea of the plaintiff in error, setting up the statute of limitations of one year in the cause of action sued on. It appears that shortly after the accident in which defendant in error, Carroll, received his injuries, he instituted an action in the city court of Birmingham, Ala., to recover damages therefor. Said action came on for trial, and, as appears from the opinion of the supreme court of Alabama, on substantially the same evidence as introduced in this action, Carroll recovered a judgment for damages. On appeal to the supreme court of the state of Alabama, the judgment of the city court of Birmingham was reversed (11 South. 803), and the cause remanded for error in refusing to instruct the jury to find for the defendant; the court in a very able opinion, supported by reason and authority, holding as follows:

"(1) Under the common law, both in Alabama and Mississippi, a master is not liable for an injury inflicted on one servant through the negligence of a fellow servant. In Alabama this rule is modified by the employers' liability act, but no similar law is in force in Mississippi. Plaintiff was injured while employed on defendant's railroad as a brakeman, the injury being sustained in Mississippi, through the negligence of his fellow servants. Plaintiff, a citizen of Alabama, was working for defendant under a contract made in that state, and defendant was a corporation organized under the laws of the same state. Held, that plaintiff could not recover in Alabama for the injuries, the action not being maintainable in Mississippi.

"(2) The fact that the negligence which produced the casualty transpired in Alabama will not take the case out of the general rule.

"(3) The fact that the contract between the parties was made in Alabama

does not make the employers' liability act a part of the contract, so that a failure to perform any of the duties prescribed by the act would render defendant liable for any consequent injury, wherever received."

It thus appears that the decision of the supreme court of Alabama was upon the merits, and was adverse to any recovery on the part of the present defendant in error. Immediately on the filing of the mandate of the supreme court of Alabama, the defendant in error, Carroll, dismissed his action in the city court of Birmingham; and on the 9th day of May, 1893, alleging himself to be a citizen of the state of Mississippi, brought suit in the circuit court of the United States for the Northern district of Alabama on the same cause of action. 60 Fed. 549. Among other pleas interposed by the defendant company was one that the cause of action was barred by the statute of limitations of one year, based upon sections 2612 and 2619 of the Code of Alabama of 1886. To this plea the defendant in error filed a replication, setting up the commencement of the said suit in the city court of Birmingham, in the state of Alabama, upon and for the identical causes of action, the recovery of a judgment in the said city court, and afterwards, upon appeal to the supreme court of the state, the reversal of the said judgment on the 22d day of November, 1892; and that afterwards, and before the expiration of one year from the time of reversal of said judgment, the plaintiff, on the 9th day of May, commenced this present suit against the defendant for the identical causes of action and injuries complained of in the said suit in said city court of Birmingham. This replication was based upon section 2623, Code Ala., which reads as follows:

"On arrest or reversal of judgment, suit must be brought within a year. If any action is brought before the time limited has expired, and judgment is rendered for the plaintiff, and such judgment is arrested or reversed on appeal, the plaintiff, or his legal representatives, may commence suit again within one year from the reversal or arrest of such judgment, though the period limited may, in the meantime, have expired; and in like manner, if more than one judgment is arrested or reversed, suit may be recommenced within one year."

To the foregoing replication the defendant below, plaintiff in error here, filed a rejoinder, setting up all the proceedings in the city court of Birmingham, Ala., and in the supreme court of the state, particularly as reported in 11 South. 803, and averring that the case was decided in the supreme court on its merits, and that the said action in said city court of Birmingham was voluntarily dismissed by the plaintiff therein; and charging, further, that, under this state of facts, the plaintiff's action in the circuit court did not come under the influence of the exception in the statute of limitations, as provided in section 2623 of the Code of Alabama, and that the present suit is not and cannot be brought under the authority or by virtue of said section 2623, so as to bring this action within the exception to the bar of the statute of limitations. To this rejoinder the defendant in error filed a demurrer. On the first hearing of this demurrer, the trial judge, relying upon the construction given by the supreme court of the state to section 2623 of the Code of Alabama (Roland v. Logan, 18 Ala. 307; Napier v. Foster, 80 Ala. 379), held that the rejoinder was a sufficient answer to the replication,

and overruled the demurrer thereto. The result of this ruling was a verdict and judgment for the defendant, and thereupon the plaintiff in the court below sued out a writ of error to this court. The writ of error coming on to be heard in this court, two questions were argued: First. The statute of limitations of one year applying to plaintiff's action, was the case brought within the exception provided in section 2623, Code Ala., by plaintiff's voluntary dismissal in the city court of Birmingham? Second. Was the plaintiff's cause of action ex delicto, and within the statute of limitations of one year, or was it an action ex contractu, and not within the bar made by the statute of one year?

This court, on hearing and argument, held as follows:

"Considering that the cause of action of the circuit court, under the allegations of the declaration, arose from a contract, and in point of time is within the letter of the statute, and that the plea of the statute of limitations should not have been sustained, it is ordered that the judgment of the circuit court be reversed, and the cause be remanded, with instructions to grant a new trial."

This ruling disposed of all the questions raised by the demurrer to the rejoinder, and it must be taken as deciding that the action instituted by the then plaintiff in error (Carroll) was not barred by the statute of limitations. The ruling now assigned as error was one sustaining the demurrer, raising exactly the same question determined in this court on the former writ of error. It is clear that the trial court did not commit reversible error in following the decision of this court, for such was the command in the mandate. It is equally clear that the ruling complained of cannot be re-examined in this court. It is a well-settled and long-established rule that whatever question has been decided by an appellate court on writ of error cannot, in the same suit and in the same appellate court, be re-examined. Supervisors v. Kennicott, 94 U. S. 498; Clark v. Keith, 106 U. S. 464, 1 Sup. Ct. 568; Chaffin v. Taylor, 116 U. S. 567, 6 Sup. Ct. 518.

The errors alleged in two of the assignments are that the court erred in overruling the motion to dismiss the suit, and in refusing to instruct the jury to find for the plaintiff in error, because the evidence disclosed that at the time of the institution of the suit the defendant in error was a citizen of Alabama, and not a citizen of the state of Mississippi. The issue as to the citizenship of the defendant in error was made by a plea to the jurisdiction of the court, and, after the evidence on the subject on the part of the defendant in error was adduced, the counsel for plaintiff in error moved the court to dismiss the case for want of jurisdiction, and afterwards, when all the evidence was adduced and before the case was submitted to the jury, the counsel for the plaintiff in error moved the court to instruct the jury to find for the plaintiff in error, because, at the time of the institution of the suit, the defendant in error was a citizen of Alabama, and not a citizen of the state of Mississippi. It is shown by the record that the plaintiff in error was a corporation organized under the laws of the state of Alabama. The defendant in error was born and reared in Alabama, and was a citizen of that state when he entered the service of the plaintiff in error. He

was injured June 18, 1890, in the manner hereinbefore set forth. On December 5, 1890, he instituted a suit for damages against the plaintiff in error in the city court of Birmingham, Ala., where he recovered a judgment. On appeal to the supreme court of Alabama, the judgment was reversed on the merits of the case. Carroll v. Railroad Co., 11 South. 803. The judgment having been reversed by the supreme court of Alabama, November 22, 1892, the defendant in error very soon thereafter left the state of Alabama, carrying his trunk and all his clothing with him, for the purpose, as he testifies, of making his home with his half-brother in Yazoo or Sharkey county, Miss. Prior to his departure from Alabama, and after his arrival at his brother's home, in Mississippi, on January 8, 1893, he made declarations to several of his friends and acquaintances to the effect that his object in leaving Alabama was to take up his permanent abode in Mississippi, and live with his brother. The evidence shows that the defendant in error was unable to do much work on account of his crippled condition, and before going to Mississippi had depended largely on his mother and a brother who resided in Alabama for support. He went to Mississippi, according to the testimony of himself and half-brother, upon the invitation of the latter, to make the house of his half-brother his home. It also appears that the defendant in error wrote a letter from Mississippi to his counsel, in Alabama, some time during the "latter part of January, or in February, 1893," and, the letter having been lost or mislaid, counsel testified as to its contents, as follows:

"Well, he wrote that he had received an invitation from his brother in Mississippi,—Campbellsville, Yazoo county; the letter was written from there,—telling him to come and make it his home, and that he had accepted that invitation, and had gone out there, and was making it his home, and expected to continue to live there."

The attorney further testified that he had not advised the defendant in error to go to Mississippi, and knew nothing of his change of residence until the receipt of the letter, above mentioned. The defendant in error corroborated this testimony, and further testified that he had not been advised by any one to change his residence, and that, at the time he left Alabama, he was ignorant as to the effect of a change of residence upon his right to maintain his suit in the United States court. A few days after writing the above letter, and on February 13, 1893, the defendant in error dismissed the suit pending in the state court of Alabama, and on May 9th following instituted the present suit in the circuit court. After filing suit in the circuit court, he remained in Mississippi a few months, and about October 1, 1893, returned to Alabama, as he testified, to attend the trial of his case. Before his departure, at the date last mentioned, he stated to several of his companions that he would return to Mississippi in about three weeks. On November 11, 1893, a trial of his case was had, and there was a judgment against him on the ground that his action was barred by the statute of limitations of one year. Following this judgment, the defendant in error did not return to Mississippi, but remained in Alabama, where he registered as a voter, May 12, 1894, attended pre-

cinct political meetings, was sent as a delegate to a county political convention, and voted at an election held during that year. While the defendant in error testified that, at the time he registered, he was ignorant of the laws of Alabama affecting his right to register and vote, and thought that a residence of only three months in the state was sufficient, the testimony of the registrar indicates that his information was not so limited. Upon this point the registrar of beat 9 of Bibb county, in 1894, testified as follows:

"Q. Was Mr. Carroll, during the month of May, 1894, in Bibb county? A. I saw him. Q. State whether or not he registered before you. A. He registered before me on the 12th of May. Q. State whether or not you administered any oath to him. A. I administered the registration oath in full. Q. Did you ask him any questions as to his residence? A. Yes, sir; I asked him if he had been a citizen of the state of Alabama for a year; and I asked him if he had been a resident in the county for three months, and if he had been in the beat thirty days. Q. What did he reply in answer to those questions? A. He replied that he had."

The plea to the jurisdiction of the court was filed October 1, 1895. Although it was the avowed purpose of the defendant in error to return to Mississippi within three weeks from the date of his departure from that state, October 1, 1893, he remained in Alabama about two years, exercising, meanwhile, the right to vote, and did not return until this court, on error, reversed the circuit court as to the bar of the statute, nor thereafter, until the plea challenging his citizenship of the state of Mississippi was filed.

As to the qualifications of an elector in Alabama, it is provided by the Civil Code of that state (volume 1, § 319) as follows:

"Every man, a citizen of the United States, * * * who is twenty-one years old, or upwards, who shall have resided in this state one year, three months in the county, and thirty days in the precinct or ward next immediately preceding the election at which he offers to vote is * * * a qualified elector, and may* vote in the precinct or ward of his actual residence, and not elsewhere, for all officers elected by the people. * * *"

"Sec. 321. No person shall lose or acquire a residence either by temporary absence from his place of residence without the intention of remaining, or by being a student," etc.

If the defendant in error had been a citizen of Alabama for the period of 12 months when he registered, May 12, 1894, he surely was not, during the same period, a citizen of Mississippi, as, throughout his entire testimony, he claimed to be. If he was a citizen of Mississippi when he took the registration oath in Alabama, his conduct entitles his testimony to but slight consideration at the hands of a court of justice. The sudden determination of the defendant in error, after the reversal of his case by the supreme court of Alabama, to make Mississippi his home, and his early departure thereafter from Alabama; the dismissal of his suit in the state court of Alabama, and the institution of suit in the circuit court following soon after his arrival in Mississippi; his comparatively brief stay in the latter state, coupled with his expressed intention, on leaving in October, 1893, to return in three weeks; his subsequent prolonged residence in Alabama, and his active participation in political conventions while there; his registration in Alabama as a voter, together with the subsequent exercise by him in that state of the right of

suffrage, one of the most persuasive indicia of citizenship, and its usual accompaniment, applying the term "citizenship" to male persons who have attained their majority; his hurried departure from Alabama, following the filing of the plea to the jurisdiction of the court,—impress us with the conviction that the defendant in error merely changed his residence temporarily, without effecting a change of domicile, and that while absent in Mississippi he was simply a sojourner there, having no fixed intention to remain. The animo manendi was wanting, without which a change of domicile may not be accomplished. The act of removing, and the intention to remain in the new place of abode, must both concur to effect a change of domicile; and, if either of these ingredients be lacking, the old domicile remains, and a new one is not acquired. We are not unmindful of the principle that a citizen may instantly change his domicile, and thereby confer jurisdiction upon the courts of the United States, but such change must be actual, not pretended; the removal must be a real one, with the intention of remaining, not merely ostensible.

Taking the foregoing view of the case as made by the evidence, we are of opinion that the trial judge would have been warranted in taking the case from the jury, and directing the dismissal of the action as one not properly within the jurisdiction of the court. Act 1875, § 5 (18 Stat. 472); Williams v. Nottawa, 104 U. S. 209; Railway Co. v. Swan, 111 U. S. 379, 4 Sup. Ct. 510; Farmington v. Pillsbury, 114 U. S. 138, 5 Sup. Ct. 807; Manufacturing Co. v. Kelly, 160 U. S. 327, 16 Sup. Ct. 307. See, also, Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449; Morris v. Gilmer, 129 U. S. 328, 9 Sup. Ct. 289; Turner v. Trust Co., 106 U. S. 554, 1 Sup. Ct. 519; Little v. Giles, 118 U. S. 596, 7 Sup. Ct. 32.

As, however, the court was not asked to make such disposition of the case after the evidence in relation to the citizenship of defendant in error was all adduced, and as there was a slight conflict in the evidence in relation to said citizenship, we are not prepared to hold that the submission of the issue of citizenship to the jury was erroneous. Railway Co. v. Ohle, 117 U. S. 123, 6 Sup. Ct. 632, is an instructive case in point. We notice in this connection that, without objection from either side, the issue as to jurisdiction was submitted to the jury with the merits, under directions to find a general verdict. The practice is not commendable. In such a case a general verdict for the defendant leaves it in doubt whether the plaintiff loses his action because the court is without jurisdiction, or because he has no case on the merits.

In the progress of the trial one Henry Milan was introduced and sworn as a witness for the plaintiff below, and as to said plaintiff's situation testified as follows:

"Q. Do you know what his financial condition was? A. Yes, sir; I guess I do. Q. What was it? (The defendant objected to this question.) Q. Did he have any means of support there, that you knew of? A. None whatever. (The defendant objected to this question and answer, because it is irrelevant, immaterial, and illegal. The court overruled this objection, and the defendant then and there, in open court, duly excepted.) Q. State whether or not you know if he had any way of supporting himself. A. He had no way of supporting himself, that I know of, at that time, nor hadn't had. Q. Was

his brother at work at that time?  A. No, sir.  Q. What was the condition of his mother?  A. Bad condition.  The only way she had of making her living was by the needle.  (The defendant objected to this last question, and moved the court to exclude the answer, because the same is immaterial, illegal, and irrelevant, which objection and motion the court overruled, and the defendant then and there, in open court, duly excepted.)"

This evidence had no legitimate bearing on any issue in the case, and we may well say of it, as was said in a similar case by the supreme court in Pennsylvania Co. v. Roy, 102 U. S. 451, 460:

"This proof, in connection with the impairment of his ability to earn money, was well calculated to arouse the sympathies of the jury, and to enhance the damages beyond the amount which the law permitted; that is, beyond what was, under all the circumstances, a fair and just compensation to the person suing for the injuries received by him.  How far the assessment of damages was controlled by this evidence as to the plaintiff's family it is impossible to determine with absolute certainty, but the reasonable presumption is that it had some influence upon the verdict."

After the close of the evidence, during the argument before the jury, counsel for plaintiff, among other things, said:

"Now, as to the question of damages; and really it seems to me that is the only question you have to consider.  There is no iron-bound rule telling you what damages to give.  You cannot give plaintiff more than he claims, but can give him every cent he claims, which is $50,000.  There are certain rules laid down by the courts which are intended to be guides to you in arriving at the amount of damages it is proper to give.  These rules say, in estimating damages, you may take into consideration plaintiff's age, his health, what he was earning at the time he was injured, what he earns or is able to earn now, his sufferings, physical and mental, and give him enough to compensate him for those losses.  You first take a man's age and health, and from that try and arrive at his expectancy in life,—how long he may expect to live.  Many insurance companies make it a part of their business to form some idea on that point, from statistics and otherwise  Some of these companies take the average life of a thousand men, say, and from that arrive at about how long a man expects to live: and these averages say, in this case here, that a man 22 years old, in good physical condition, can reasonably expect to live 40 years longer.  There are eminent men who have gone to work to find this out.  Then you must take into consideration the amount that the man was earning at the time that he was hurt, and consider, in connection with that, how much he can earn now, or if he had been totally disabled.  At the time he was hurt he said he made about seven or eight trips a week.  He got $2.25 for each single trip, and he made seven or eight of those single trips; put it at seven, the lowest number.  That would be about $16 a week.  He made about that much a week.  There are four weeks and a half in a month.  So, multiply sixteen by four and a half, and that amounts to $70 to $75; about $900 a year, what he was earning.  Now, look at him, and say what he is able to earn now.  And, when you take that into consideration, it is not for you to say that he must quit his chosen field of labor, and go at something else; but could he earn anything in his chosen field of labor?  Not a dollar.  They wouldn't even take him down here to be a flagman, because he couldn't get about fast enough.  They take one-legged men sometimes, but not a man who hasn't any feet at all.  They wouldn't take them.  So, in forty years' time,—if you look at it that way, as you have a right to do,—in forty years' time he would earn $36,000.  I propose to present this question of damages in its various lights, and allow you to say what plaintiff shall have.  It might be objected that $36,000 would be too much to give plaintiff for his loss in earnings alone; that it would not be proper to give him, in a lump, the amount he would earn in forty years.  All right; let us look at it in another way.  What amount, put out at interest, would produce $900 per year.  Calculate it at seven per cent., and that is about all the interest you could safely count on getting, and it would take about $13,000.  Now, add to that enough to compensate him for his physical sufferings, and then add

enough more for his mental suffering, and you will about reach all we claim. Give him $50,000. It is not too much; and you may rest assured neither this court nor any other court will set it aside as being excessive. (The defendant objected to this argument of the counsel beginning with the words, 'some of these companies,' and ending with the words, 'in 40 years' time he would earn $36,000,' because it is not a proper basis for damages in a case of this sort, and moved the court to exclude the same from the jury, because it does not lay down the proper rule for the estimate of damages in a case of this kind, and because it is misleading. The court overruled this motion of the defendant, to which ruling of the court the defendant then and there, in open court, duly excepted.)"

In his charge to the jury all the trial judge said on the question of damages is as follows:

"Now, if you should be of the opinion that there was negligence here, under the law and the facts of the case, and the jurisdiction of the court is maintained, then the next thing is how much damages ought he to have. And on that subject you will consider the degree of disability,—whether he has been left by this accident disabled to do anything. Well, there ain't much doubt about that. There isn't much controversy about that by counsel, because the man is very little able to earn anything now. But I say that is to be considered, and his age when the accident happened, and his capacity for earning wages at and before that time.—that is to be considered. Twenty-two years was his age. There was a suggestion that he might be promoted,—certainly, but I think that is not insisted upon. I think that, perhaps, is going a little beyond the rule. Of course, he might be promoted to the superintendence of a railroad company, like the others, but I say that is going a little too far. But his sufferings, mental and physical— On the idea of mental suffering, counsel perhaps gave it a pretty wide range, but I think the rule is for the jury to consider sufferings, mental and physical, as you will consider it."

To this part of the charge the plaintiff in error duly excepted, and the foregoing remarks of counsel and the charge of the judge in relation to damages are assigned as error.

The remarks of counsel stated an incorrect method of arriving at the measure of damages, were unfair, and tended to mislead the jury, and there was error in permitting the same to go to the jury. In Railway Co. v. Farr, 12 U. S. App. 520, 528, 6 C. C. A. 211, and 56 Fed. 994, in a similar case, exactly the same error was committed. In relation to it the learned judge announcing the opinion of the court said:

"This was a manifest error. The present value of the earnings of 40 years to come, if absolutely assured, is much less than 50 per cent. of their amount, at any rate of interest that prevails in the Indian Territory; and when it is considered how uncertain these earnings are, how many chances of disability, disease, and disposition, condition the probable earnings of a young man, the rule announced is absurd. Nor was the vice of this argument, or of the court's approval of it, anywhere extracted in the general charge. The judge contented himself with the harmless remark, upon this branch of the case, that if the jury found for the plaintiff they should allow such a sum as would compensate him for his pecuniary loss sustained, or that he would hereafter sustain, by reason of the disabilities caused by his injuries, but that they should not assume that he was entirely incapacitated because he could not perform the duties of a brakeman, but should consider his power to earn money in other stations of life. He nowhere condemned the vicious and misleading rule for measuring the plaintiff's pecuniary loss which the plaintiff's attorney had laid down and he had approved. We repeat here what we had occasion to say in Railway Co. v. Needham, 3 C. C. A. 129, 52 Fed. 371, 377: 'General remarks of this character in the course of a charge, while they may tend to show that the court really entertains sound views of the law, do not extract the vice of an erroneous instruction, positive in its terms, which directs the jury to allow damages on a wrong basis.' Nor do these remarks of the

attorney constitute a fair argument. The jury is sworn to determine the issues of the case according to the law and the evidence given them in court, and no argument is fair which misstates the evidence, or misleads the jury as to the law."

In all this we fully concur.

Further on in the argument of the case another counsel for plaintiff said in part to the jury:

"The court will charge you that, if you find that the plaintiff is entitled to recover, then he can recover just compensation for all the injury done him, including physical as well as mental suffering. It is true that we have no rule by which to measure or weigh suffering, pain, either physical or mental. You heard the plaintiff testify that he would not express in words his suffering, which has been continuous from the injury, June 19, 1890, up to the present. Now, what amount will be just to award him for all his suffering? When you come to consider the mental suffering, will it be right to exclude all consideration of what suffering a normal mind would undergo in all these long years, when contemplating the condition to which the plaintiff has been reduced, so that, as the evidence shows you, that without those artificial limbs he has to crawl from bed to chair and from chair to bed? Will you exclude all the suffering that naturally came from young manhood's hopes blasted; that came from the realization that he was a crawling pauper, and that he could never hope to marry; that no woman would marry a pauper? I will ask any husband on that jury, I ask any father on that jury, can you measure the comfort and the joy that a life with a loving wife has brought you in dollars and cents? Can you say how much money would compensate you for being deprived of any pleasure of life as you step about in full-grown manhood, 6 feet in your stocking feet and 22 years old? How much money would compensate you to deprive you of the power of creating your kind, and transmitting your blood and your name to your child? (The defendant objected to and moved to rule out that part of the argument of counsel beginning with the words, 'I will ask any husband,' and ending with the words, 'name to your child,' because there is no such evidence as will support it in this case; which motion the court overruled, and the defendant then and there in open court, duly excepted. Counsel continuing:) I do not say that there is a scintilla of evidence in this case that this man was deprived of his genital organs, of his physical power to get child, or his physical power to enjoy connection with woman. I didn't get down to so low and brutal a plane as that. There is no such evidence. But I ask you, as common-sense men, tell me where you will find on the face of this globe his equal in society, his equal in intelligence, his equal in position, and his equal in physical condition, a woman who would marry that man, cut up and shriveled up as he is. Who would do it? Tell me, if in all this broad land you could find a woman, as I said, his equal in intelligence and position, who would voluntarily consent to become his wife and become the mother of a pauper child? And what sort of children does a pauper beget? That is what is the matter with this country now. You frequently hear it said that pauperism and crime go hand in hand. In one sense of the word, just as the mother walks along with her child,— the hand of the little pauper child in hers,—just so pauperism and crime go. When you make a man and woman paupers, and whenever those paupers beget children and bring pauper children into this world, the chances are very strong that the whole brood will be criminal. (The defendant objected to and moved the court to exclude that part of the argument of counsel from the jury beginning with the words, 'I do not say,' and ending with the words, 'the whole brood will be criminal,' because it is not a legitimate basis of damages, does not lay down the proper rule for the estimate of damages in a case of this kind, and is unfair and misleading; which motion the court overruled, and the defendant then and there, in open court, duly excepted."

So far as the record shows, the trial judge permitted the foregoing remarks to go to the jury with his quasi approval. There was nothing in the complaint or in the evidence to warrant such argument. The remarks were an appeal to the sympathies of the jury on matters

entirely outside of the case, and were calculated to arouse the prejudice and mislead the jury as to the proper rule of damages as well as on other issues in the case. That these objectionable appeals to the prejudices of the jury did mislead them, and procure a verdict on a false basis, somewhat appears by the amount of the verdict actually rendered, which is sufficiently large, at the legal rate of interest in the state of Alabama, to give the defendant in error an income in excess of what he could have earned if he had not been injured, and had c'tinued a railroad brakeman during his natural life, and at his death leave his capital intact. We understand the general rule to be that the remarks of counsel to the jury on the merits, to constitute reversible error, must be objected to at the time, be unwarranted by the pleadings and evidence, have a tendency to mislead or prejudice the jury, and be to more or less extent approved by the trial judge.

The bill of exceptions shows the following proceedings:

"And the defendant then and there requested the court to give the following written charge: '(14) The court charges the jury that rule number 126, set out in plea number 8 of defendant, is a reasonable rule,'—which charge the court gave, with the modification thereto as appears in this bill of exceptions in the oral charge of the court; to which modification of said charge the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. And the defendant then and there requested the court to give the following written charge: '(15) The court charges the jury that if they believe from the evidence that the plaintiff disobeyed said rule number 126, as set out in plea number 8 of defendant, and did not examine said link to see if it was in proper condition, and that such disobedience of said rule contributed proximately to his own injury, then he cannot recover,'—which charge the court refused to give; to which action of the court in refusing to give said charge the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. And the defendant then and there requested the court to give the following written charge: '(16) The court charges the jury that rule number 242, as set out in plea number 9 of defendant, is a reasonable rule,'—which charge the court gave, with the modification thereto as appears on this bill of exceptions in the oral charge of the court; to which modification of said charge the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. And the defendant then and there requested the court to give the following written charge: '(17) The court charges the jury that if they believe from the evidence that the plaintiff disobeyed rule number 242, as set out in defendant's plea number 9, and did not examine the link to see if it was in proper condition, and that such disobedience of said rule contributed proximately to his own injury, then he cannot recover,'— which charge the court refused to give; to which action of the court, in refusing to give such charge, the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. And the defendant then and there requested the court to give the following written charge: '(18) The court charges the jury that rule number 245, as set out in defendant's plea number 10, is a reasonable. rule,'—which charge the court gave. And the defendant then and there requested the court to give the following written charge: '(19) The court charges the jury that if they believe from the evidence that the plaintiff disobeyed rule 245, as set out in defendant's plea number 10, and did not inspect or aid the conductor in inspecting the cars when the train stopped for water or for other trains, and that such disobedience of said rule contributed proximately to his own injury, then he cannot recover,'—which charge the court refused to give; to which action of the court, in refusing to give said charge, the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. And the defendant then and there requested the court to give the following written charge: '(20) The court charges the jury that inasmuch as the

plaintiff had possession of the rule book of the defendant corporation, and read the rules pertaining to signals, he is charged with notice of the other rules in the said book pertaining to the duties of freight brakemen,'—which charge the court refused to give; to which action of the court in refusing to give said charge the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted. * * * And the defendant then and there requested the court to give the following written charge: '(22) The plaintiff, in hiring his service to the defendant as a brakeman, is to be considered as bound to have the skill and knowledge requisite to the proper performance of the duties pertaining to that position, and he is to be conclusively presumed, if he had access to the rules of the company touching the performance of those duties, to have known such rules; and if it appears from the evidence that the rules required the plaintiff, as brakeman, to inspect and examine the links and drawheads in the train, then, if such examination would have disclosed the defect in said link, the plaintiff cannot recover, for his failure to examine the said appliances was negligence which precludes his recovery. If, on the other hand, such examination would not have disclosed such defects, the same being latent, the defendant is not responsible therefor, and the accident is to be taken as embraced in the risks of the service, for which there can be no recovery,'—which charge the court refused to give; to which action of the court, in refusing to give such charge, the defendant then and there in open court, and in the presence of the jury, before the jury withdrew, duly excepted."

The record further shows the modifications of the trial judge in relation to rules 126 and 242, as follows:

" '(14) The court charges the jury that rule No. 126, set out in plea No. 8 of defendant, is a reasonable rule.' The Court: I suppose I may say that, but, of course, it must be shown that the plaintiff knew of this rule or had the means of knowing. With that understanding I give the charge. '(16) The court charges the jury that rule No. 242, as set out in plea No. 9 of defendant, is a reasonable rule.' The Court: A reasonable rule, but it must be brought home to the knowledge of the plaintiff. Not only so, but it must not be a rule that tends to shift the burden of the duty which rested upon the defendant railroad company to furnish reasonably safe appliances for the operation of its train."

The specific instructions requested as to rules 126, 242, and 245, although strikingly pertinent as to subject-matter to the case in hand, were properly refused by the trial judge, because they do not recite, as a prerequisite to their application, that the jury should find from the evidence that the plaintiff in the court below had access to, or was charged with notice of, the rules of the company, and for this we find no error in the refusals to charge as requested. The charge requested above, numbered 22, however, is not open to the same objection, and should have been given to the jury. There was evidence tending to show that the plaintiff below had access to the rules of the company, and he testified himself that he had examined the said rules for the purpose of finding out his duty in regard to signals. The rules are reasonable, and the trial court so held, and the propositions of law contained in the requested charge are sound, and applicable to the facts of the case. If the defendant in error had access to the rules of the railway company, and was charged with notice of their requirements, and such rules were reasonable, and required the defendant in error, as a brakeman on the train, to inspect the links and drawheads, and the defendant in error neglected to make such inspection, which inspection would have shown the defective character of the link which caused the accident, resulting in the injuries complained of, it is clear

that the defendant in error, by his own negligence, contributed to his own injury. If, on the other hand, a proper inspection would not have shown the defective character of the link causing the accident, because the defect was latent, and not discoverable on inspection, then it is clear that the defendant in error cannot recover, because the accident and his resulting injuries were the assumed risks of his service; and this conclusion is strengthened, for this case, when we consider that the defective link was not one furnished directly by the railroad company, but came with a foreign through car, which the railroad company was bound to forward without delay, and without such opportunities to inspect as existed in relation to its own cars. When through cars are received from a foreign road, an inspection by train employés is about the only inspection practicable. The rules of the plaintiff in error required such inspection on the part of the defendant in error, and if he ought to have made it, and did not, or if he made it and the defect was latent, and the defective link was the cause of the accident, then the defendant in error should not recover.

There is no question but that railroad corporations should require, at their peril, cars, their couplings and appliances, to be reasonably inspected by competent agents, and that the ordinary employé may rely on such inspection, nor that this applies to cars received for through transit from other roads as well as its own; but it does not follow that what may be reasonable inspection for a home car shall be demanded as alone reasonable for a foreign car, received for through transit. The time, place, and general opportunity for inspection, and the fact that the foreign car comes to hand as one actually on trial, showing its fitness, all should be considered, in view of the rapid transit now furnished by the railroad companies, and demanded by the business public. Every trainman of ordinary intelligence and experience knows that there is and must be a decided difference in the inspection possible between the home cars and the foreign cars on through trains, and it is not unreasonable to hold that what necessary risks attend the inspection of the latter are risks of the service. We are aware that the adjudged cases are not wholly with us on the matter of the inspection required of foreign through cars, but, until the supreme court of the United States shall speak to the contrary, we must hold with those cases which recognize the actual situation,—the actual way the business is and must be carried on, if carried on at all, —rather than with those cases which tend to make the railroad companies absolute insurers against all the risks of a well-known dangerous employment.

In Railroad Co. v. Meyers, 22 C. C. A. 268, 76 Fed. 443, 445, it is said:

"If a car be accepted for transportation over the road of the receiving company, it is clear that defects which are 'visible or discoverable by ordinary inspection' must be repaired sufficiently to make the use of the car reasonably safe. Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590."

In Mackin v. Railroad Co., 135 Mass. 201, 205, the supreme judicial court of Massachusetts says:

"In the present case, however, it appears that the car was not owned by the defendant, but came from the West, and was received upon the defendant's road at its western terminus, at Greenbush, and was drawn to Boston, and

thence to Brookline; and it is contended by the defendant, as the true construction of the bill of exceptions, that the destination of the car when received was Brookline, and that the defendant did not use it in the local business of the corporation, but merely drew it to its original destination, and unloaded it, and was about to draw it back to Boston, to be in readiness for its return to the West. These latter facts are not stated in express terms, but, if true (although, perhaps, the mere ownership is not material), a car so received, while in transit to its destination, and until ready for such inspection as would be suitable and necessary in preparation for its return, would not come within the rule applicable to machinery and appliances furnished by the defendant. According to the course of business, well known to the plaintiff, and notorious, the defendant was in the habit of receiving many such cars daily, and drawing them over its road as a part of its freight trains. Even in the absence of any statute or special contract, regulating the terms of receiving and drawing such cars, the defendant was bound, as a common carrier, to receive and draw them. Vermont & M. R. Co. v. Fitchburg R. Co., 14 Allen, 462, 469. The obligation of drawing cars over its road would not extend to such as were in an unsafe condition; but, as to cars so received, the duty of the defendant is not that of furnishing proper instrumentalities for service, but of inspection, and this duty is performed by the employment of sufficient competent and suitable inspectors, who are to act under proper superintendence, rules, and instructions; and, however it may be as to other cars, the inspectors must be deemed to be engaged in a common employment with the brakemen as to such cars while in transit, and until ready to be inspected for a new service."

Goodrich v. Railroad Co., 116 N. Y. 398, 22 N. E. 397, holds that a railroad corporation owes to its employés the same duty of inspecting the cars of another company used upon its own road as if they were its own, and is responsible for the consequences of such defects as would be discovered by ordinary inspection; and the opinion of the court of appeals of New York is instructive, so far as applicable to the facts of the present case, and we quote:

"It was decided in Gottlieb v. Railroad Co., 100 N. Y. 462, 3 N. E. 344, that a railroad company is bound to inspect the cars of another company used upon its road, just as it would inspect its own cars; that it owes this duty as master, and is responsible for the consequences of such defects as would be disclosed or discovered by ordinary inspection; that when cars come to it from another road, which have defects visible or discernible by ordinary examination, it must either remedy such defects or refuse to take them. This duty of examining foreign cars must obviously be performed before such cars are placed in trains upon the defendant's road or furnished to its employés for transportation. When so furnished, the employés whose duty it is to manage the trains have a right to assume that, so far as ordinary care can accomplish it, the cars are equipped with safe and suitable appliances for the discharge of their duty, and that they are not to be exposed to risk or danger through the negligence of their employer. The defect complained of in this case was obvious and discernible to the most ordinary inspection, and could have been easily remedied. It is argued by the defendant that it had fulfilled its duty when it had furnished for the use of its employés crooked links, which could be used in coupling together cars upon which the bumpers were of different heights. We do not think that in this case that fulfilled the measure of defendant's obligation. It could not be so held unless it was the duty of the plaintiff to examine and inspect the cars to ascertain whether the coupling appliances were in proper condition. The duty of examination, like the duty of furnishing proper machinery and appliances in the first instance, rests upon the master. Fuller v. Jewett, 80 N. Y. 46; Gottlieb v. Railroad Co., supra. And the degree of vigilance required from a railroad corporation in this respect is measured by the danger to be apprehended and avoided. Ellis v. Railroad Co., 95 N. Y. 546; Salters v. Canal Co., 3 Hun, 338. While in the case of corporations the performance of this duty must be committed to employés, there is no presumption that it rests upon any particular individual. It is not within the apparent scope of a brakeman's duty,

and does not necessarily rest upon him. In the absence of all evidence upon the subject, we cannot, therefore, presume that the examination and inspection of the particular cars in question had been committed to the plaintiff, and, unless it had, he had a right to assume that the master's duty had been performed by those having it in charge, and that the coupling appliances upon the cars were adequate to the performance of his work, without extraordinary risk or danger." Pages 401, 403, 116 N. Y., and page 397, 22 N. E.

In the present case, was it the duty of the plaintiff below to examine and inspect the cars, to ascertain whether the coupling appliances were in proper condition? The determination of this question should have been submitted to the jury, when it was properly presented, as we think it was, in requested charge No. 22, above set out.

There are many other important questions presented by the assignment of errors, but we do not think it necessary to pass upon them, because the judges are not agreed as to their proper disposition, and as, from those assignments we have considered, it is necessary to reverse and remand, we indulge in the hope that on another trial such questions may be eliminated, or else so ruled that error will not lie thereon. The judgment of the circuit court is reversed, and the cause is remanded, with instructions to award a new trial.

MAXEY, District Judge. I concur in the judgment of reversal as announced by the presiding judge; but I cannot assent to the proposition, maintained by him, that the twenty-second special instruction, requested by the plaintiff in error, should have been submitted to the jury. The trial court properly refused the instruction, because it did not embody correct principles of law. It was the duty of the plaintiff in error, as master, and not that of a mere subordinate employé, as was the defendant in error, to inspect the couplings of the train, with the view of discovering and remedying defects in the appliances. Railroad Co. v. Mackey, 157 U. S. 72, 15 Sup. Ct. 491; Goodrich v. Railroad Co., 116 N. Y. 398, 22 N. E. 397; Gottlieb v. Railroad Co., 100 N. Y. 462, 3 N. E. 344; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590; Railway Co. v. Daniels, 152 U. S. 684, 14 Sup. Ct. 756.

McCORMICK, Circuit Judge, dissents.