## NATIONAL BISCUIT CO. v. NOLAN.

(Circuit Court of Appeals, Eighth Circuit. May 11, 1905.)

No. 2,065.

1. EXPERT TESTIMONY.

The issue on trial being whether the defendant was guilty of actionable negligence in not providing the plaintiff a reasonably safe place in which to work about machinery, it was not competent for the machinist, whose duty was to look after the machinery and see that it was in good running order, without more, to testify that in his opinion the machinery should have been safeguarded, as it usurped the province of the jury to determine such question of fact from all the evidence.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, § 2318.]

2. SAME.

The opinions of so-called experts are not received if all the facts can be ascertained and made intelligible to the jury, or if it is such as men in general are capable of comprehending and determining.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§ 2308, 2310.]

3. PERSONAL INJURIES—DAMAGES—EVIDENCE.

On trial to a jury, the plaintiff was permitted to testify that she depended upon herself for support. Held to be error, as such a rule would create a shifting scale for measuring compensation for personal injuries, making it depend upon the pecuniary condition of the sufferer.

[Ed. Note.—For cases in point, see vol. 15, Cent. Dig. Damages, § 498.]

4. APPEAL—PREJUDICIAL ERROR—PRESUMPTIONS.

Where improper evidence is received which might have had a tendency to unduly influence the minds of the jury, the presumption is that it was prejudicial, and the verdict should be set aside.

5. INJURY TO SERVANT—MASTER TO FURNISH A REASONABLY SAFE PLACE TO WORK.

This rule is always conditioned that the employer is only bound to ordinary and reasonable care, as applied to the circumstances under which the liability arises, to furnish a reasonably safe place and machinery, and so as not to impose upon the employer the burden of being held as an absolute insurer of the employé, or so as not to excuse the employé from the exercise of reasonable care to avoid an obvious danger, or to not needlessly expose himself to a danger which due care on his part would avoid.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 172, 173, 178, 179.]

6. SAME—WARNING SERVANT OF DANGER.

Where the place assigned the employé, of full age, good intelligence, and experience, is not necessarily dangerous, and no injury would occur but for the employé unnecessarily exposing himself outside of the line prescribed for his work, the master cannot be held to have reasonably anticipated such abnormal movement.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, §§ 312, 313.]

7. SAME—CONTRIBUTORY NEGLIGENCE.

Where the employé, a girl of age and intelligence, who had worked for six weeks at a table where the machinery was guarded by being boarded up, and is transferred to work at another table near by, where the machinery is not so boarded up, and this fact is obvious to her, and after working there several hours she thrust her arms through endless chains, held apart by iron bars 4½ feet apart, moving at the rate of one every six seconds, to replace a piece of paper which had fallen from a shelf, whereby her arms were broken by coming in contact with such moving

bars, she cannot recover damage from the employer on the ground that she did not see the moving bars prior to the accident, and that the employer had not warned her of their existence.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

This is an action to recover damages for personal injuries, in which the jury returned a verdict in favor of the defendant in error, the plaintiff below, for the sum of $3,500. On motion for new trial, the court conditioned the overruling thereof on the remission of $1,000 of the amount, which was accepted by the defendant in error. To reverse the judgment entered thereon, the defendant below prosecutes this writ of error.

The plaintiff in error, a corporation, on the 25th day of August, 1902, was engaged in operating a bakery in the city of Minneapolis, Minn. Its specialty was the manufacture of what is known as "cookies." The building in which the work was conducted consisted of six stories. The cookies were prepared on the sixth floor, and carried to the second floor in pans by means of what is called a "conveyor," operated by steam. These pans were conducted to a level with the tables on the second floor, and by rollers carried along the table to the further end, where the pans were received by a man who lifted and turned them edgewise on a carrier moving about 2½ feet above the table, nearly back to the other end of the same, where such pans, after being emptied, were returned again to the sixth floor. This conveying was done by two endless chains, about three feet apart, moving perpendicularly from the sixth floor down to and around a shaft or revolving rod, situated, approximately to the center line of said receiving tables on the second floor near one end and parallel with the table. Said pans rested on dogs or brackets attached to the conveyor. There were several tables on said second floor, about 20 feet long and 4 feet wide, and 2 feet 10 inches from the floor. There was a trough, circular shaped at the bottom, extending along the center line of the table, into which the broken cookies were thrown as they were picked off the pans by the girls stationed at the tables doing the work. The pans of cookies as they descended the elevator came to the west end of the table, and thence were slowly carried east over the surface of the table by rollers to the east end. Eight girls, four on each side of the table, picked the cookies from the pans and put them into a little trough, about 3½ inches deep, running along on each side of the outer edge of the table, and afterwards packed them in boxes placed on stands near by. After the cookies had thus been removed the pans would be at the east end of the table, where they were taken by another workman and put in another conveyor, which carried them back edgewise along such central line nearly to the west end of the table, where two endless chains came down from the sixth floor, passed around said shaft or roller, 16 inches above the line surface of the table, and about 26½ inches from the edge of the table on either side. The endless chains which passed perpendicularly from the sixth floor around said shaft or roller were held apart by what is known as "spreaders," which were made of strips of iron 1¼ inches wide and one-eighth of an inch thick. There were intervals between the spreaders of 4½ feet, and the chains and spreaders ran around said shaft at the rate of about 42 feet per minute; that is, about 10 of the spreaders passed a given point each minute. At all the tables, except table No. 1, hereinafter mentioned, there was a wooden framework through which the spreaders and chains passed, situated 9⅛ inches above the sprocket shaft. The chains and spreaders passed downwards on the north side of the rod or shaft, and passed around it and up on the south side, being carried by means of sprockets on the shaft. There was on the table a little shelf called "cartoon shelf," running parallel with the top of the table, about 16 inches above the same, nearer the south side than the north side of the table, the north edge of which shelf was 32 inches from the north edge of the table, and about 7 inches wide. The defendant in error worked at table No. 2, about 7½ feet from table No. 1. She had been so engaged for about six weeks prior to the accident in question. About 6

o'clock p. m. on August 25, 1902, she moved from table No. 2 to table No. 1, to take the place of one of the girls who dropped out. Under the direction of the lady in charge of this immediate work, she took a position on the south side of the table, and about half an hour before the accident, on her own volition, she moved around to the north side of the table to work. While so engaged, a piece of wrapping paper used in said packing fell from said shelf on the opposite side from where she stood onto one of the pans, which she picked up, and reached her arms through the open space between said endless moving chains to replace it on the shelf. In so doing, her arms were caught by one of the cross-bars between said chains, called a "spreader," and were broken by being carried up against a wooden crosspiece. At the time of the accident the place where she stood was well lighted.

Other facts will appear in the course of the following opinion.

Koon, Whelan & Bennett, Ralph Whelan, and William H. Bennett, for plaintiff in error.

Henry W. Benton and Joseph W. Molyneaux, for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge, after stating the case as above, delivered the opinion of the court.

Two preliminary questions are presented by the assignment of errors, which are not unimportant to be settled. One Rothenberger was being examined as a witness by counsel for defendant in error. After merely testifying that he was a general mechanic, employed by the plaintiff in error as its master mechanic to look after the machinery and keep it in running order, counsel for defendant in error asked the following question: "Well, you say you are a machinist; in your opinion, was it machinery that needed to be guarded?" To this question counsel for plaintiff in error objected, on the ground that it was immaterial and called for the conclusion of the witness. The court overruled the objection, and the witness answered, "Yes, sir." This, in our opinion, was error. One of the crucial questions on trial before the jury was whether or not reasonable care on the part of the employer required that the part of the machinery where the endless chains and spreaders passed the place where the defendant in error was at work should have been protected by safeguards to prevent the accident in question. Necessarily, this was a question of fact to be developed before the jury from all the attendant circumstances, which would address themselves to the common sense and understanding of 12 men of average intelligence. As such, it was clearly susceptible of proof of the conditions comprehensible to the common understanding of the triers of the fact. It was not shown that the witness had any special experience founded on observation as to the necessity of guarding such place. He only knew, so far as the evidence developed, the mechanical structure of the machinery, and whether it was in good running order. He was not asked as to whether such machinery was dangerous in its operation, and it was no more proper to ask this witness for an expression of his opinion as to whether the place should have been guarded than it would have been to ask him

whether or not in his opinion it was dangerous for the girl to thrust her arms into the place whereby they would be brought into contact with the rapid movement of the spreaders. For him to answer the bald question as to whether the machinery needed to be guarded was to usurp the province of the jury, based on all the facts and circumstances, as respected the situation of the defendant in error at the time and place. The opinion of so-called experts is not received "if all the facts can be ascertained and made intelligible to the jury, or if it is such as men in general are capable of comprehending and understanding." 7 Amer. & Eng. Enc. of Law, 493; Neilson v. Chicago, etc., Ry. Co., 58 Wis. 516, 17 N. W. 310; Watson v. Milwaukee Ry. Co., 57 Wis. 332, 15 N. W. 468; New Jersey T. Co. v. Brabban, 57 N. J. Law, 691, 32 Atl. 217; 2 Labatt, Master & Servant, § 830; New York Elec. Equip. Co. v. Blair, 79 Fed. 896, 25 C. C. A. 216; Graham v. Penn Co., 139 Pa. 149, 21 Atl. 151, 12 L. R. A. 293; Sappenfield v. Main Street, etc., Ry. Co., 91 Cal. 48, 27 Pac. 590.

The defendant in error was permitted, over the objection of plaintiff in error, to testify that she was dependent upon herself for support. This was also error. Whether she was rich or poor, with or without an adequate income outside of her manual labor, in no manner affected her right to recover compensatory damages resulting directly from her injuries. Such compensation would include her physical and accompanying mental suffering, if any, loss of time, the value thereof based on her earning capacity at the time of receiving the injury, and any prospective loss based upon the probable continuation or permanency of such disability. Ala. G. S. R. R. Co. v. Carroll, 84 Fed. 772, 780, 781, 28 C. C. A. 207; Pennsylvania Co. v. Roy, 102 U. S. 451–460, 26 L. Ed. 141. Any other rule would create a shifting scale for measuring compensation for such injury, making it dependent upon the pecuniary condition of the sufferer.

Error presumptively works a prejudice to the party against whom it was committed, and this presumption is only overcome when it appears beyond a doubt that the error challenged did not prejudice and could not have prejudiced the complaining party. Deery v. Cray, 5 Wall. 795, 807, 808, 18 L. Ed. 653; Smiths v. Shoemaker, 17 Wall. 630, 639, 21 L. Ed. 717; Moores v. Bank, 104 U. S. 625–630, 26 L. Ed. 870; Gilmer v. Higley, 110 U. S. 47–50, 3 Sup. Ct. 471, 28 L. Ed. 62; Railroad Co. v. O'Brien, 119 U. S. 99–103, 7 Sup. Ct. 172, 30 L. Ed. 299; Mexia v. Oliver, 148 U. S. 664–673, 13 Sup. Ct. 754, 37 L. Ed. 602; Railroad Co. v. O'Reilly, 158 U. S. 334, 337, 15 Sup. Ct. 830, 39 L. Ed. 1006; Peck v. Heurich, 167 U. S. 624, 629, 17 Sup. Ct. 927, 24 L. Ed. 302; Railroad Co. v. McClurg, 59 Fed. 860, 8 C. C. A. 322, 325; National, etc., Association v. Shryock, 73 Fed. 774, 20 C. C. A. 3, 11; Railroad Co. v. Holloway, 114 Fed. 458, 52 C. C. A. 260; United States v. Gentry, 119 Fed. 70, 55 C. C. A. 658, 663. So, although there may have been competent evidence sufficient to sustain the verdict, yet if improper evidence was received which might have influenced the jury, or the chances are even that it may have had a tendency to injuriously affect the minds of the jury, the verdict should be set aside. Lowry v. Harris, 12 Minn. 255 (Gil.

166); Hoberg v. State, 3 Minn. 262 (Gil. 181); Farmers, etc., Bank v. Whinfield, 24 Wend. 420.

The learned trial judge was evidently impressed with the fact that the jury displayed ill judgment or temper in exaggerating the amount of the damages, as he compelled a remittitur of part of the award. It is impossible, however, to say whether or not it fully neutralized the sympathy naturally aroused in the mind of the jury by the vice of this evidence. Where the beneficiary of such evidence insists upon its admission against the protest of the adversary party, every presumption of the fullest tendency of its hurtful effect should be indulged.

A more important question remains to be answered, which is, should the trial court have granted the request made by the plaintiff in error for direction to the jury to return a verdict for the defendant below on the whole evidence? This case presents an apt illustration of the frequent abuse of the wholesome rule of law that imposes upon the master the obligation only to exercise ordinary and reasonable care to furnish a safe place in which the employé is assigned to work, so as not to expose him to unnecessary hazards. Choctaw, O., etc., R. R. Co. v. Holloway, 191 U. S. 338, 24 Sup. Ct. 102, 48 L. Ed. 207. This rule is always hedged about with reasonable conditions, such as will not impose upon the employer the burden of making him the absolute insurer of the safety of the employé, nor excuse the employé from the exercise of reasonable care on his part to avoid such dangers as are obvious to his eyes, or not to unnecessarily expose him to a danger which the exercise of reasonable care on his part would avoid. Negligence is always a relative question. It is that degree of care and circumspection which a reasonably prudent person may be expected to exercise under like circumstances.

This case is presented throughout by counsel for defendant in error as if she was then a mere novice and a girl of tender years. But the evidence shows that she was neither a minor nor a dolt. On the contrary, she was a woman over 18 years of age, and, under the laws of the state of Minnesota, she was "considered of full age for all purposes." Section 2, c. 59, p. 613, vol. 1, Gen. St. Minn. 1878. She was a manumitted person. And, as evidence of her intelligence, she had, prior to working for the plaintiff in error, learned and practiced the art of stenography. In the spring of 1902 she had worked in another like factory operated by machinery, but in which the baked material was delivered by hand at the tables where packed. She had worked for six weeks prior to this accident at the table next to the one where she was injured. It is true that at table No. 2, where she had so worked, the return elevator by which the empty pans were raised to the sixth floor was inclosed, for about three or four feet above the sprocket shaft, with boards screwed onto the framework, and then for a space in the center of about seven feet uninclosed, and above the uninclosed space again inclosed on the side, but not in the center, so that the boards would have prevented putting her hands into the place between the spreaders, or perhaps, seeing between them, in her immediate front. But

for about three weeks table No. 1 had been in operation without such guard. That she knew this fact when she went to table No. 1 to work must be conceded. She worked all the time in full view of said machinery conveying the pans to said table No. 1, only 7½ feet from her, and saw other girls at work there. The appliances carrying the pans were open to her view, and she could not have looked that way without observing that it was unguarded. Characteristically of such cases, she saw everything about the machinery carrying the pans except the spreaders. She could tell where the elevator was. At the table where she stood at the south side, she admits that the elevator "was right beside my [your] face," so that as she faced her table she "looked into the elevator that carried the pans up." She could not help hearing the sprockets and chains going around, and she admits that had she looked she could have seen the chains and sprockets. The photographs in evidence demonstrate to an absolute certainty that it was a physical impossibility for her to have failed to see the spreaders if she looked at all before her, for they were in plain view. There were intervals of 4½ feet between the spreaders, and the chains ran around the shaft at the rate of about 42 feet per minute, so that about 10 of the spreaders passed a given point every minute, or one in every 6 seconds. If she did not see this, it was because she shut her eyes to the view. Is it possible that the law, based upon common sense and in recognition of the instinct of self-preservation, will allow that she should unbidden, of her own volition, thrust her arms between the moving chains, without thought of her own safety, and without a search of the eye to observe the spreaders only 4½ feet apart, passing every 6 seconds? Where she stood at the post of duty assigned her, she was clear outside of the revolving chains and spreaders. She was exposed to no danger therefrom. It was no part of her assigned work to expose her hands and arms so as to come in contact with such spreaders. Why, therefore, invoke the doctrine of the duty of the master to advise her of a possible danger to which her allotted work did not expose her? The employer could not reasonably have anticipated that such a paper would chance to drop from its shelf, and much less anticipate the reckless, foolhardy act of this girl, thoughtlessly thrusting her arms through the chains, with the passing spreaders—an act which she could have omitted without dereliction of duty, and which could have been picked up by one of the girls on the opposite side of the table with absolute safety. Is it any palliation of her thoughtlessness that at the table where she had hitherto worked the chains were boarded up as above stated? She knew that table No. 1 had been recently installed; she saw that the endless chains and meshwork there were not protected as at table No. 2. This very fact was calculated to excite her curiosity and inquiry, and put her on her guard. Why should the lady overseer, in assigning the defendant in error to table No. 1, be held to have been guilty of negligence in not warning her that the revolving chains were not boarded up, when that fact was just as well known and apparent to the girl as to herself? Why should she be held to have been guilty of negligence in not pointing out to the

defendant in error the presence of the spreaders and chains, when that fact was open and obvious to her eyes? Especially so when her work lay outside of this machinery, and when it was not possible to have received the injury without this intelligent, self-poised girl heedlessly and unnecessarily putting her arms in a place of danger. The other girls worked at this table for three weeks without any accident, and there was nothing in the situation to excite any reasonable apprehension on the part of the lady overseer that this girl would do such a thoughtless act as to thrust her arms through such a meshwork of machinery to recover a piece of paper. It is a misconception of the law to apply to such a situation liability on the part of the master on the ground of a failure to provide a safe place for the servant to perform her work. As said by this court in St. Louis Cordage Co. v. Miller, 126 Fed. 495, 513, 61 C. C. A. 477, 495, 63 L. R. A. 551, "One cannot be heard to say that he does not know or appreciate a danger whose knowledge and appreciation are so unavoidable to a person of ordinary intelligence and prudence in a like situation." The liability of the employer in such cases is conditioned that "if the employé himself has been wanting in such reasonable care and prudence as would have prevented the happening of the accident, he is guilty of contributory negligence, and the employer is thereby absolved from responsibility for the injury, although it was occasioned by the defect of the machinery, through the negligence of the employer." Washington, etc., R. R. Co. v. McDade, 135 U. S. 570, 10 Sup. Ct. 1044, 34 L. Ed. 235.

The law does not impose upon the master the extreme obligation to warn the servant "of every possible manner in which injury may occur. He must examine his surroundings, and take notice of obvious dangers and the operation of familiar laws." Nor can he demand that he shall be warned against risks that are as obvious to him as to the master. Miss. River Logging Co. v. Schneider, 74 Fed. 201, 20 C. C. A. 390; Dresser, Emp. Liab. § 99; Goodridge v. Washington Mills Co., 160 Mass. 234, 35 N. E. 484. As said by Judge Sanborn in St. Louis Cordage Co. v. Miller, 126 Fed. 508, 61 C. C. A. 490, 63 L. R. A. 551:

"A preliminary question for the judge always arises at the close of the evidence before a case can be submitted to the jury. That question is, not whether or not there is any evidence, but whether or not there is any substantial evidence upon which a jury can properly render a verdict in favor of the party who produces it."

In view of the indisputable facts in this case, it was not one to be turned over without comment by the court to the jury, to indulge the impulse of sympathy rather than give heed to the voice of the law.

The judgment of the Circuit Court must be reversed, and the cause remanded for further proceedings in conformity with this opinion.