## ARMOUR & CO. v. SKENE.

### (Circuit Court of Appeals, First Circuit. February 19, 1907.)

### No. 671.

**1. WITNESSES—CROSS-EXAMINATION—COLLATERAL MATTERS.**

It was not an abuse of discretion for the trial court to permit a witness on cross-examination to be asked, for the purpose of discrediting him, whether he had been drinking on the day of the injury and at the time of the trial.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1106–1108.]

**2. EVIDENCE—EXPRESSIONS OF PAIN.**

In an action for injuries, statements of witnesses as to plaintiff's expressions of pain were competent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 377–382.]

**3. APPEAL—HARMLESS ERROR.**

In an action for injuries to plaintiff by defendant's runaway team, a witness testified that C., defendant's superintendent, was at the scene within a few minutes after the accident and identified the team as belonging to defendant, and, in reply to a general question as to what the superintendent said, the witness answered: "This is Armour's team that has done this, and we are liable." On objection, the court allowed the answer to stand de bene, and stated that he would instruct the jury, without further testimony, that it had no effect, and as to the question of liability it had no probative value. During the trial it was admitted that C. was defendant's local superintendent, and that the team belonged to defendant, and the court expressly charged that C.'s statement could not be considered at all as an admission of liability. *Held*, that defendant was not prejudiced, under such circumstances, by the admission of such answer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4161–4170, 4178–4184.]

**4. SAME.**

Where, in an action for injuries to plaintiff by a collision with defendant's runaway team alleged to have been negligently permitted to remain unattended in a street, the evidence establishing the identity of the team as belonging to defendant, and that the horse was left at the curbstone with the reins thrown over his back, and later started to run, and came into collision with plaintiff's vehicle and caused the injury, such facts warranted a verdict in favor of plaintiff, and hence defendant was not prejudiced by a technical error in the admission of evidence that the driver was relieved by defendant of his employment nearly a year after the accident.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4034.]

Putnam, J., dissenting.

In Error to the Circuit Court of the United States for the District of Massachusetts.

Philip B. Adams and Arthur P. Hardy, for plaintiff in error.

Charles H. Fiske, Jr. (Andrew Fiske, on the brief), for defendant in error.

Before PUTNAM and LOWELL, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. Agnes Skene was injured in Waltham by a runaway team, which came into collision with a buggy in which she was sitting. It was alleged that the team belonged to Armour & Co., and that the injury resulted from the carelessness of its agents. The particular act of negligence, pointed out in the proofs, was that the driver threw the reins over the horse's back, and went away leaving him unhitched in the street.

There are over 40 assignments of error in this case, something, at least, unusual in an ordinary personal injury case. We do not think it necessary, nor would it be useful, to discuss the merit of the various assignments seriatim. We do not characterize the exceptions as a whole as frivolous, but it is true that they are largely frivolous, and controlled by principles of law and rules of practice so familiar as not to require discussion. As, for instance, the exception with reference to the cross-examination of Macdonald, the driver, who was asked if he had been drinking on the day of the injury, and whether he had been drinking at the time of the trial, is something controlled by a familiar rule of practice. It is quite true that whether he had been drinking on the day of the trial, something like six years after the injury, was clearly collateral to the question of negligence at issue, and had nothing to do with it; but it is not unusual or improper on cross-examination to resort to reasonable collateral expedients for the purpose of discrediting a witness. It is unquestionably within the discretion of the trial judge to give reasonable scope in that respect, and it is a discretion not reviewable except in cases involving extreme and clearly unwarrantable latitude. And the exception with reference to the city ordinance, which was received and properly explained as something not conclusive, but as a piece of evidence to be considered with the other proofs in the case as bearing upon the alleged fact of negligence which the jury were to determine as an ultimate question, and the numerous exceptions with reference to the opinions of nonexperts and the statements of witnesses as to the plaintiff's expressions of pain, involve no unfamiliar or unsettled questions.

The only two assignments of error which we feel called upon to consider at length are those which relate to the admission of evidence both of which involve technical error.

It was a necessary element of Miss Skene's case to show that the team belonged to the company. To do this, as properly might be done, a witness was called to show that Mr. Cunningham, the local superintendent of the company, was at the scene within a few minutes of the accident, and identified the team as one belonging to Armour & Co. The question, which we think we ought to accept as intended to identify the team, an identification competent to be proven by the admissions of the superintendent, was rather broad, as the witness was asked the general question as to what Cunningham said, and the witness replied: "This is Armour's team that has done this, and we are liable." Although there was no direct proof as to the relation which Cunningham sustained to the Armour & Co. business, it did appear in various ways that he assumed direction of affairs, and at the end of the trial the fact was not at all in controversy that he was local superintendent. Therefore the first part of the answer as to the identity of the team was com-

petent as relating to something within the scope of his authority. Moreover, this part of the exception is based upon the merest fiction, because it was practically conceded before the trial ended that it was an Armour & Co. team that injured Miss Skene.. It was necessary, however, for the plaintiff at the outset to offer proofs tending to connect the injury with an Armour & Co. team, because it was a thing then apparently not conceded. This being so, it was not an unusual thing to allow that part of the answer of the superintendent to stand de bene, and, when upon the whole case it became a conceded fact without direct proof that he was local superintendent, so much of the answer as related to the identity of the team was rendered competent. But while that part of the exception relating to identity became mere fiction at the end of the trial, because it relates to a thing not remaining in controversy, it is still of significance upon the question as to what the purpose was in putting the original question. At the stage of the trial at which the question was asked, the matter of identity was something requiring proof, and we think it hardly reasonable to assume, because the fact of identity became a conceded fact later on, that the purpose of counsel was alone to develop the incompetent matter as to liability.

The last part of the answer as to liability was incompetent. But we think it only reasonable to assume that the incompetent part was not brought out intentionally. Objection was promptly made, and the court said: "I shall admit it de bene, and I shall instruct the jury that, without further testimony, it has no effect, and as to effect including liability it may not be of the least probative value." Thus the court removed present consideration so far as it could, and left the answer to stand, to be made good as to the question of identity, provided Cunningham's relation to the company should be established, at the same time making a distinction against that part which related to liability as something which might not be of the least probative force under any circumstances. Later, by way of instruction, the court limited the statement to the admission that the team belonged to the defendant, and expressly and emphatically told the jury that it could not at all be considered as an admission of liability. We think a formal and impressive statement of that kind by way of instruction is quite as effective in the direction of removing inadvertent, incompetent matter, especially when made in support of an admonition given at the moment of its being delivered from the witness stand, as any of the various means adopted for relieving a trial from the influence of accidental and incompetent statements made in the hearing of a jury. Trials can only be as fair as "the lot of humanity will admit," and it often happens that witnesses in answering, unwittingly and to the surprise of counsel, mix incompetent matter with the competent, and the only relief, as trials go, is through removing the effect by proper caution and admonition.

We must presume that the jurors understood the court to mean what it said, and considered the case independently of the statements of Cunningham as to liability, as the court told them they should do. If there were anything in such a situation leading to a reasonable suspicion that the incompetent matter was purposely brought out, the verdict would, of course, be set aside, partly upon the ground of punishment, and partly upon the ground that it made the trial an unfair one. It often happens

as trials go, and it cannot be otherwise in the very nature of things, that incompetent, and in a sense prejudicial, matter crops out accidentally and without design on the part of anybody. It usually comes from untrained witnesses who have no knowledge as to what is competent and what is incompetent, and such matter is generally removed by a ruling, and nothing more is thought about it. These things are inevitable, and it is necessary in the administration of justice that the trial should be accepted as a fair one, if the effect is cured by proper cautions and instructions from the trial court. It sometimes happens that incompetent matter is ruled in, after discussion and deliberation, as something competent for the jury to consider, and, when found later in the trial to be incompetent, that it is withdrawn from the case under strong cautions to the jury, and the authorities are numerous which sustain verdicts as based upon a fair trial under such circumstances. Furthermore, as to the matter under consideration, it cannot with technical exactness be said that error was committed, because the evidence in question was never in fact admitted; it at most was only allowed to stand de bene under caution. But, quite aside from this, we think we ought to hold that the effect of what Cunningham said about liability was eliminated by what was said by the court.

The next point which we consider relates to alleged error in permitting the plaintiff to show that the driver was discharged from Armour & Co.'s employment about a year after the runaway which caused the injury. This point is upon a different ground, because the evidence was admitted and allowed to stand.

In former times, under a rule existing in many jurisdictions, it was competent to show in personal injury cases that highways, sidewalks, and appliances upon railroads and in mills were immediately repaired upon knowledge of the injury. Such evidence was received as showing something in the nature of an admission by the town, city, or railroad alleged to be at fault. The old rule has been overthrown in many jurisdictions where it was formerly administered, and unquestionably does not exist in the federal courts; but, when trials were had under the old rule, proofs of repairs to be admissible must not be remote in point of time, and, in order to have any weight or probative force whatever with the jury, necessarily must have been closely related to the time of injury, because it stands to reason that nothing would be proven by way of admission to show that ice or snow was removed from the sidewalk a year after an injury by ice, or that a hole in a country road was repaired a year after an injury in question. This results because such conditions are necessarily and naturally subject to change of seasons, and it is therefore understood that it was necessary under the old rule to connect the situation at the time of the change with the situation at the time of the injury in order to make repairs or changes competent evidence as admissions of any weight whatever for the jury.

If the evidence as to the driver's discharge bore at all upon any question which the jury had to decide, it would be upon the ground that the discharge was in the nature of an admission that he was careless at the time of the accident. We are quite unable to see that a discharge from employment a year after this runaway could have

possibly influenced the jury one way or the other upon the question of care, or want of care, in respect to the accident in question. If the discharge had immediately followed the injury, it is possible that the jury might have been influenced by the inference that he was discharged because he was careless; but proof of the discharge a year afterwards, without in any way connecting it with the circumstances of the accident, could not, as we look at it, have influenced the jury in any substantial manner upon questions which it had to decide. A hundred things may have happened during the year to cause the discharge. It may have been that he was discharged because he was profane, or because he demanded more pay or less hours, or because he advised co-employés to demand more pay or less hours. It requires no greater stretch of imagination to connect the discharge with one of these things than it does to connect it with the accident. The conclusion therefore is that, while the admission of the evidence of discharge involved technical error, it was so immaterial and shadowy in respect to the questions of fact which the jury was to decide that it should be treated as harmless.

The doctrine of harmless error, which seems to be a growing one in the evolution of law, apparently does not offend the idea of a fair trial. A collateral thing, connected immediately with the time or thing in question, may sometimes be treated as not remote, and admitted as something having a tendency to show where the fact is; but, on the contrary, the same thing may be so remote in point of time or nature as to be wholly immaterial and inadmissible, because if admitted it would have no weight, and if excluded would do no harm, and under such circumstances, if its admission involves technical error, it may be treated as harmless. The whole theory, of course, is that the trial, under such circumstances, is a fair one, because the result, after all, is uninfluenced by the technical error with respect to a thing not having substance. If we were persuaded that harm had been done in this case, or if we had any substantial doubt upon the question, we should feel bound to direct a new trial; but, upon the whole, we cannot see that we have a substantial doubt. There was a long trial before a jury. The plaintiff called a witness who saw a team, which it is true she did not identify as Armour's team, but one which she described as "a yellow team with black marks on it, black letters"; a gray horse and yellow wagon. The witness further testified that she saw it drive up Felton and Williams streets; and that she saw the driver throw the reins over the horse's back and go into a saloon, leaving the horse unfastened. It was not so much a question of identifying the man as the team. The substantive weight of the evidence came from the fact that she saw a driver, not a particular driver, and that the driver left the horse unfastened, and that, while the driver was in the saloon, the horse ran like a flash down Williams street. As we have already pointed out, it was not so material to identify the man as the team, with the gray horse and the yellow wagon with black letters, in a runaway down Williams street. Another witness, Addie M. Hagar, who heard a disturbance and went to the door recognized the large heavy team of Armour's in collision with the buggy in which the plaintiff was sitting, and in a few moments Mr. Cunningham,

the superintendent, was at the scene of the accident, and recognized the team as one belonging to Armour & Co. True, as argued, the witness who described what occurred, when the horse was left in the street unhitched, and what occurred as the horse started, did not recognize the driver at the trial, but she did describe the horse as gray, and the wagon as yellow with black marks and letters. It is also true that she could not see that Armour & Co.'s name was on the wagon, because she could not read, but the fact that she could not read made the question of identity through a description of the color of the horse and the wagon none the less reliable and effective, and, if her description did not fix the identity, it was easily open to attack. The train of circumstances unexplained—the gray horse and yellow wagon with black letters, at the curbstone, with the reins thrown over the back of the horse, the same witness or witnesses seeing the same team in a start from the curbstone in a runaway, and a team of the same description, seen by other witnesses, involved in a collision which caused the injury—makes the case a strong one for the plaintiff, and we do not think the technical error at all changed the result from what it would have been if the technical error had not been made. Therefore it would not seem to conserve justice to disturb the verdict. The chances are very decidedly in favor of the idea that, if a new trial was had, at the expense of time and money, the result would be the same.

The judgment of the Circuit Court is affirmed, and the defendant in error recovers costs in this court.

PUTNAM, Circuit Judge (dissenting). This case relates to two admittedly plain errors, unless cured as to one by the subsequent rulings of the court. Those errors were the result of evidence offered by the plaintiff below, whom we will hereafter call the plaintiff, admitted under circumstances we will explain in full, and persistently put in by her. The evidence erroneously admitted was put in by the plaintiff with so much persistency that it is plain that she regarded it as advantageous, and therefore as prejudicial to the defendant; and the only ground upon which a new trial can be refused is that the court is asked to be wiser than the plaintiff, and thus find that it is clear that the evidence offered was not prejudicial to the defendant, although the plaintiff evidently acted on an opinion to the contrary, and notwithstanding she knowingly and persistently led the court into the errors complained of, and therefore presumptively ought not to be excused from the results thereof. A judgment here for the plaintiff would be so seriously in avoidance of the absolute rules of law, and the practical application thereof, firmly fixed by the Supreme Court, and would also do so much injustice to the defendant, that we are compelled to dissent from the result which the court has reached.

This is an action at law in tort, in which Armour & Co. was the defendant in the Circuit Court. The verdict and judgment were for the plaintiff. There are several counts in the declaration, all alleging that the plaintiff was run down by the defendant's wagon or horse, and injured; but the case as made was that the defendant's horse was negligently left by its driver unfastened, and thereupon ran away, and came into collision with the wagon in which the plaintiff was

sitting, causing the injury. The negligence is not alleged to have been that of the corporation per se, but of its "servants and agents." No particular servant or agent was named, but the evidence showed that the defendant's team was in charge of its driver, one Macdonald. The injury occurred at Waltham, in Massachusetts, in May, 1900, while suit was brought on June 27, 1905, more than five years after the accident, and the case was tried in March, 1906, nearly six years after it. The plaintiff is a lady 71 years of age, residing in Massachusetts, and the defendant is a corporation publicly known to be very wealthy, and against which a very considerable public impression has been created of late through the newspapers. In view of these facts, and especially in view of the long time between the event and the trial, there were special reasons why the jury should have been guarded against loose and improper inferences, and the case tried on the legitimate facts properly proven.

The plaintiff contended at the trial that the driver went into a saloon to get a drink of intoxicating liquor, and meanwhile left his horse unhitched, and the horse ran away. The case for the defendant was that the horse slipped on a cross-walk for some reason for which the defendant was not liable, and thereupon the horse, being frightened, ran away. The defendant was supported on this point by the testimony of the driver, Macdonald, and by that of one Halloran, who seems to have been an unchallenged witness, and who testified unqualifiedly that he saw the horse slip on a flat flagstone crossing, and fall, and that then, notwithstanding the driver's efforts to hold him, he got away from him. The barkeeper at the saloon where the driver was claimed to have gone for his drink testified that the driver was not there that day. Of course, this was negative testimony, while that of Halloran was positive. On the other hand, the only evidence in behalf of the plaintiff as to the origin of the accident was that of one Katrine Boudro, who testified that she saw the driver throw the reins over the horse's back and go into the saloon. She also testified that the horse started to run, and that some of the men came out of the saloon and ran after him; but, although she was cross-examined carefully on this point, she could not identify Macdonald in any way, even when he stood up in court in her presence. This was the entire proof in behalf of the plaintiff as to the way in which the accident originated. Under these circumstances, it is natural that the conclusion of the jury on the main issue, as to which the testimony could hardly be reconciled, was quite certain to be determined by the improper, though impressive testimony admitted into the case, first, that the driver Macdonald was afterwards discharged by the defendant, and, second, the proof of the statement of Cunningham, the defendant's local superintendent, that Armour & Co. was at fault.

The testimony of Macdonald to which we have referred was given by him when a witness for the defense. On cross-examination by plaintiff, he was asked whether he was then a drinking man. This was objected to by the defendant, but was admitted on the ground that it was preliminary to asking him whether he was a drinking man on the day of the accident. The answer was not insisted on, but the topic was pursued as follows:

"Q. Were you or not at that time a drinking man?  A. Yes, sir.
"Q. Had you drank on the 2d day of May?  A. No, sir.
"Q. You have been drinking now, haven't you?"
This was objected to by the defendant, but the court admitted it, and an exception was taken; and it was answered, "Yes, sir."

Mr. Cunningham, the local agent of the defendant corporation, was previously called as a witness by the plaintiff, who questioned him with reference to Macdonald's drinking. All this shows that the plaintiff deemed it for the interests of her case to maintain that Macdonald was a drinking man at the time of the accident, and ever so continued down to and including the trial, and that the plaintiff was persistent in bringing out facts establishing that line of proof. We shall refer to this again in connection with the precise exception by the defendant to certain other testimony to which this present line of examination was intended to lead the jury.

The case therefore turned on the question of the negligence of the driver, with the very important incidental issue with reference to his habits. Notwithstanding this, the plaintiff was permitted to prove by Cunningham, the local agent of the defendant at Waltham, where the accident happened, called as her witness, that Macdonald was discharged about a year or so after the accident. This was put in notwithstanding five distinct objections by the defendant, so that the plaintiff was acting with her eyes open, and under such circumstances that she ought to take the consequences of what she did. The bearing of this evidence was not explained by the court to the jury; neither was the fact that it was not to be regarded by the jury on the question of liability pointed out to them.

Very likely neither the court nor the plaintiff's counsel had in mind the change in the general practice to which we will hereafter refer, and they were therefore governed by the earlier practice in accordance with which such testimony was often admitted without question. On being interrogated at our bar, counsel for the plaintiff gave no reason for the introduction of the testimony, except that he understood that Macdonald, the driver, would be called by the defendant. If Macdonald had subsequently been called by the defendant, the plaintiff, of course, could have asked him, or any other witness, whether he was still in its employment, for the purpose of enabling the jury to give proper weight to his testimony, but she had no right to anticipate in this way the possibility of his being called; and it is plain that there was no reason whatever for bringing out the fact that he had been discharged, except for the purpose of influencing the jury on the issue of negligence, and the subordinate issue of the alleged habits of the defendant's driver, a topic which the plaintiff so persistently sought to bring to the attention of the jury.

On that issue, it is natural to suppose that the jury accepted the evidence as an admission on the part of the defendant that the driver was either negligent in this occurrence, or that his habits were continuously bad; and such an admission as to either would, in the natural course, have induced the jury to render a verdict against the defendant in the contradictory condition of the direct proofs, pro and con, to which we have referred.

It is suggested that the fact that the discharge was a year after the accident may have had effect in preventing the testimony from prejudicing the defendant. On the other hand, it seems to us that the impression which would be made on the minds of shrewd men on the jury would be the reverse, and would intensify prejudices, because, in one view, some of them would naturally reason that the driver had been kept for a year, until the probability of a suit was passed, and also the probability of the defendant's needing his testimony, and had then been discharged. But this suggestion is fully met by the persistency with which the plaintiff sought to bring out the alleged improper habits of Macdonald, both at the time of the injury and at the time of the trial, thus covering the intervening period, including the year during which he remained in the employment of the defendant. All this must have been intended to impress the jury that Macdonald's habits were continuously those of a drinking man. It may, perhaps, well be said that a test of his habits on the day of the injury, and the question of his leaving his horse on that day to go into a saloon for a drink of intoxicating liquor, could not properly have been exhibited to the jury in the reflected light of his subsequent continued habits, as sought to be proved by the plaintiff; but the plaintiff thought otherwise, and persistently conducted her case accordingly. There is nothing in the record showing that the court undertook to parry the effect of this testimony, or that the plaintiff, after persistently putting it in, did not work it for every advantage which she could possibly gain from it. It is difficult to conceive that, taking it all together, the jurors' minds did not probably carry the impression that Macdonald was discharged on account of persistent habits as a drinking man, if not in fact for his alleged carelessness on the day of the injury to the plaintiff, thus practically strengthening the presumption, in favor of the plaintiff's case, that his habits in that respect led him to neglect the team at the critical time.

Both the Supreme Court of the United States and the Supreme Judicial Court of Massachusetts have, for a very considerable time, practiced on the changed rule which we have stated, and, since this became recognized as the approved practice, no case can be found in either court involving questions of this character where, after a ruling admittting evidence of this kind, on a full objection and proper exceptions, a new trial has been refused. A marked case in the Supreme Court is Columbia Railroad Company v. Hawthorne, 144 U. S. 202, 207, 208, 12 Sup. Ct. 591, 36 L. Ed. 405, where a new trial was granted on this point alone; the opinion concluding as follows:

"As the incompetent evidence admitted against the defendant's exception bore upon one of the principal issues on trial, and tended to prejudice the jury against the defendant, and it cannot be known how much the jury were influenced by it, its admission requires that the judgment be reversed."

It will be noticed that this excerpt applies the settled rule of the Supreme Court to the effect that, where either party seeks and obtains a ruling which proves to be erroneous, the burden is on the party asking the ruling to establish the proposition that it could not have improperly influenced the verdict. The cases in the Supreme Court on this point are numerous, and it is hardly necessary to go

through them. It is sufficient to say that they are summed up in the opinion rendered in behalf of the Circuit Court of Appeals for the Sixth Circuit, in Inman Bros. v. Dudley Lumber Co., 146 Fed. 449, 455, as follows:

"We have no right to speculate as to the prejudicial effect of a plain error. If its nonprejudicial effect is not so clear as to exclude every reasonable doubt, we should reverse."

If any one is curious to see how firmly the rule as thus stated by the Circuit Court of Appeals for the Sixth Circuit is embedded in the federal practice, a mass of authorities can be found in National Biscuit Co. v. Nolan, 138 Fed. 6, 9, 10, 70 C. C. A. 436, and the long list of cases there cited could be added if desired. It, perhaps, is well enough to quote from the opinion rendered in Vicksburg & Meridian Railroad v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 118, 30 L. Ed. 299, as follows:

"While this court will not disturb a judgment for an error that did not operate to the substantial injury of the party against whom it was committed, it is well settled that a reversal would be directed unless it appears beyond doubt that the error complained of did not and could not have prejudiced the rights of the party."

Whatever might be the result if the error was one of the court, without the solicitation of either party, the rule applies here, if necessary to resort to it; but this is not necessary, because we have shown that, in a case balanced as this one is, the jury should have been carefully guarded against any improper influences, and the natural inference is that this testimony weighed heavily with the jury in behalf of the plaintiff.

We have stated that the rule announced in the case of Columbia R. Co. v. Hawthorne, 144 U. S. 202, 12 Sup. Ct. 591, 36 L. Ed. 405, is established in Massachusetts. We need cite only Hewitt v. Taunton Street Railway Company, 167 Mass. 483, 485, 486, 46 N. E. 106 which was in substance the same as the case at bar, only in one respect less favorable for the plaintiff, because, instead of proving directly that the motorman whose alleged negligence was in issue there had been actually dismissed by the defendant, the evidence objected to left on the jury only an impression, or an opportunity for an inference, that he had been "virtually discharged." For this reason alone the verdict was set aside, and a new trial granted.

The plaintiff claims, however, that there was no objection made to the question which brought out the answer to the effect that Macdonald had been discharged, so that no valid exception was taken. She says that the counsel for the defendant made no objection until after the question and answer were in, and then did not move to strike out, so that, therefore, it has no ground for exception; but the whole line of examination had been strenuously objected to, with exceptions noted. It was all brought out on re-examination by the plaintiff of one Cunningham, who was the local superintendent of the defendant, and who was called by her. The first question was as follows: "Is Mr. Macdonald in Armour's employ now?" Thereupon defendant's counsel said: "I object to that. It has no bearing on this case at all." This objection was sufficiently particular, even under

the federal practice. The court allowed an answer, and an exception was reserved. The answer was not definite enough. Then came the following question: "For what reason did he [Macdonald] leave your employ?" Defendant's counsel said: "I object to that. How can that possibly be binding on the defendant?" The court said that he might answer, and an exception was reserved. Then the witness responded: "He did not leave." Then came the question by the plaintiff: "What did he do? A. I discharged him." Then followed a renewal of the defendant's objection, and an exception was allowed; no objection being made at the time to the allowance of the exception. Ordinarily, this is a sufficient allowance of an exception without requiring the objecting party to move to have the testimony stricken out. However, the exception was in the most formal manner to the question as well as to the answer, because the whole line of examination and the question to which the final answer strictly responded, inquiring for what reason Macdonald left the defendant's employment, were properly and fully objected to, and an exception allowed. These were broad enough to cover the whole topic.

Under the circumstances, the evidence was prejudicial, and, even if not clearly so, it is not shown not to have been otherwise. It has been recognized, as we have seen, as of a class which alone is sufficient to require a new trial. It was objected to in various forms, and yet persistently called out by the plaintiff, and she should stand the consequences of her own persistent requirement in this direction. A new trial should be granted on account of this exception, if for no other reason.

The next question relates to the conversation with Cunningham already spoken of. It is plain that his position was not of that character which authorized him to bind the defendant corporation by a mere admission, and it is not now claimed that it was. Notwithstanding a long discussion between the counsel and the court, and notwithstanding that all objections were expressly reserved by the court, with the observation by it that the exceptions had been fully stated and all rights were saved, a witness called by the plaintiff was permitted to testify that Cunningham said a few moments after the accident that the colliding team was Armour's, and that Armour & Co. was liable.

This came into the case under the following circumstances: The plaintiff called a witness, Addie M. Hagar, who testified that the plaintiff lived with her at the time of the trial, and had lived with her for 10 years. Therefore we must assume that the plaintiff and her counsel knew fully what the witness would testify, so that any answer brought out by any general question to her must be assumed to have been deliberately sought, and not to have been brought into the case in a manner which surprised the plaintiff or her counsel, or which was not anticipated. She testified that she met Cunningham, apparently the first time, the day of the accident. She was permitted to testify that she had a conversation with him, which was, of course, properly admitted as preliminary. Then this question was put: "What did he say to you?" It is true that this was a general question; but, as we have already said, the plaintiff must be charged with knowledge of what the answer would be. It does not appear that either the court or the defendant had any

knowledge in reference thereto except as it was suggested, as we will show, in the discussion relative to the question which occupied, first and last, nearly four printed pages of the record.

The defendant immediately objected, on the ground that the subject-matter was "incompetent, irrelevant, and immaterial, and not a part of the res gestæ." Thereupon counsel for the plaintiff said: "We have been over all that, and your honor has ruled de bene that it was admissible." This going over, and the ruling de bene esse that was referred to, do not appear in the record; but this is of no consequence, because the whole matter was discussed in what does appear. Thereupon the court said: "I do not know what the witness says. I do not know whether it would have any bearing. I do not know what his relations were to the parties"—meaning by the word "his" Cunningham. The court repeated that he would allow the question de bene, and then added: "I shall try to properly instruct the jury as to its effect, that it must be connected before it shall have any effect, and that they shall not be prejudiced by any statement until it is connected." Thereupon the defendant made further objections, especially to the point that the testimony was allowed to go in before it was properly connected, in the following language:

"We make the further objection that it is not admissible at this time, because it tends to prejudice the jury if it should not be connected, and for the further reason that there is no connection shown between Cunningham and the accident, and no authority on his part to bind the defendant by any statement that he sees fit to make; and we object to it as being prejudicial to the defendant to offer it in evidence at this time without having been properly connected with them, as being highly prejudicial to the jury. Supposing this witness will testify that Cunningham ran up there and said: 'We are liable for this whole thing, we are at fault.' Now, we never can get that away from the minds of this jury, because they still have that with them. They will remember it, Cunningham's statement; and, if it is not lawful for that to be introduced in evidence, then it should not go to the jury at all. They should not have it under the guise of connecting it later on with some authority from Armour & Co. to make some such statement as that. Why is it not fair to the defendant, if they want to prove that, to show Cunningham's authority and relation with the company, show that first, and make it conditioned that they shall show that before they show any such statement? We are perfectly willing that this witness may be excused and called back, if they want to prove that."

Our observation as to this is that it appears from it that the defendant had some understanding of what the witness would probably include in her testimony, and most specifically objected to bringing that out; and that the defendant also clearly brought out the reasons why the court should not permit the evidence to go in unless it was first connected, and the manner in which the order of proof would prejudice the jury. In this respect the plaintiff clearly brought herself within the intimation in Clark v. Fredericks, 105 U. S. 4, 5, 26 L. Ed. 938, which we will refer to hereafter.

This was immediately followed by the plaintiff's counsel, as follows: "I do not see any objection to that, your honor." Just what he means by the word "that" is not clear. Then he continued:

"But it seems to me, under the assurances that I have given both to you and my brother Adams, that I shall show what Cunningham's connection with the matter was, whether or not he was an employé, and what his duties were,

by various witnesses—it seems to me that it is perfectly competent to let it go in now."

Then, after some conversation, the court asked the plaintiff's counsel: "Have you summoned Cunningham?" To which counsel replied: "No, I understood he was here in court." Then the court continued:

"You must conduct the testimony in your own way. I will allow you, if you desire to, not expressing my opinion as to what the better process would be in the order of testimony, but, if you desire, as a counsel in this court, to ask that question, saying that you intend to connect it in the proper way with the transaction, I will allow you to ask that question, and will allow the witness to answer."

Thereupon the defendant's counsel inquired as follows: "In order to make the record straight, may I renew my objection?" The court replied: "It may be regarded—I will state it fully that your objections are noted, and the rights of the defendant are saved." Then the exception was properly noted, and the question, "What did Cunningham say to the witness," was put. Defendant's counsel thereupon renewed his objection, and the court said: "That is renewed, and the exceptions are stated fully, and your rights are all saved." Then came in the objectionable testimony, and the defendant made a new motion to strike out; but the court still adhered to its ruling to permit the testimony de bene esse, and to afterwards instruct the jury that without further testimony it would have no effect as to liability. This was again excepted to, and the court replied: "I have only ruled so far de bene, that question and answer may not be stricken out."

This, therefore, went in under the positive assurance of plaintiff's counsel that he would properly connect Cunningham with the defendant corporation, which assurance was so far from being carried out that, so far as the record shows, not even any attempt was made in that direction. Under the circumstances, the court should have reverted to its caution to the plaintiff's counsel involved in the language which we have already given, namely, "saying that you intend to connect it in a proper way with the transaction," and should not have allowed the case to go to the jury, or, as it was allowed to go to the jury, the verdict should, in consequence of the broken pledge from the plaintiff's counsel to the court, have been set aside if for the plaintiff, and, in addition thereto, the plaintiff's counsel might well have received a reprimand for the manner in which this objectionable and prejudicial evidence got before the jury. Subsequently, at the close of all the testimony, and before the charge was given the jury, the defendant again moved to strike out the conversation with Cunningham "so far as he stated that Armour & Co. were responsible for the accident, and were liable." The court refused to strike it out, but it stated that it would charge the jury not to consider it. The court evidently thought that the interests of the defendant required that it should not strike out. Thereupon the defendant again reserved an exception. We do not note this motion, and the ruling and exception in reference thereto, except so far as it shows that the defendant never yielded its rights with reference to the admission of this conversation.

A suggestion was made in behalf of the plaintiff that, perhaps, this conversation might be regarded as a part of the res gestæ. Possibly it

was, so far as the mere ownership of the team was concerned; but this was not insisted on, and, as submitted to us, the only plausible answer to the exception is that the court finally instructed the jury to disregard the testimony so far as it bore on the question of liability. The statement as to liability was not only inadmissible (Vicksburg & Meridian Railroad v. O'Brien, 119 U. S. 99, 105, 7 Sup. Ct. 118, 30 L. Ed. 299; Union Insurance Company v. Smith, 124 U. S. 405, 423, 424, 8 Sup. Ct. 534, 31 L. Ed. 497) but it was of the gravest character so far as its influencing the jury was concerned, and it is difficult to believe that its effect was ever eradicated. It is true, as said in Hopt v. Utah, 120 U. S. 430, 438, 7 Sup. Ct. 614, 30 L. Ed. 708, and in Throckmorton v. Holt, 180 U. S. 552, at page 557, 21 Sup. Ct. 474, at page 476 (45 L. Ed. 663), that the general rule is that a direction of the presiding judge to the jury to disregard evidence improperly drawn out in the course of a trial cures the error; but it is also true, as further said, that there are instances where such a strong impression is made by such testimony that a subsequent withdrawal does not remove the effect caused by its admission.

Waldron v. Waldron, 156 U. S. 361, 15 Sup. Ct. 383, 39 L. Ed. 453, arose on an exception taken to argument of counsel. There the court directed the jury to disregard the improper expressions, and yet neither there, nor in Holt v. Throckmorton, was the verdict saved. In the case at bar, it is difficult to conceive that, in view of the peculiar conditions, the impression made on the mind of the jury was ever effaced. Here was, as we have shown, a case where it was very difficult for the ordinary jury to reconcile the conflicting testimony; yet the representative of the defendant was said to have made a statement which was, in fact, a verdict in favor of the plaintiff on the whole issue. Looking at the reasonable probabilities, this would be seized on by the jury in such a way that the jurors' minds were satisfied about it, and that satisfaction would not be impaired by anything that subsequently occurred.

After so strong an assurance as there was here that the testimony would be connected, in view of the fact that it was of such an impressive character that, presumably, it was impossible to eradicate the effect of its introduction, it would be a gross injustice not to allow the defendant clear and full relief. As well observed by the Supreme Court, in an illustrative way, in Dunlop v. United States, 165 U. S. 486, 498, 17 Sup. Ct. 375, 41 L. Ed. 799, slips are liable to occur in the heat of argument and otherwise in every trial, which must be regarded as such, and which, if remedied to the extent of the ability of the court and counsel, must be overlooked, or justice could rarely be done; but, in the case at bar, this testimony, as we have shown, was called out under such circumstances that the plaintiff is presumed to have known what it would be, and to have been seeking to draw it out deliberately. In addition to this, the testimony was ruled in after a discussion which occupies nearly three pages of the printed record, and after a positive assurance by the plaintiff's counsel that he would show what Cunningham's relation to the corporation was, an assurance which he did not follow up by even the slightest attempt to accomplish it. Therefore the whole was done deliberately.

It is true that it may be plausibly claimed that, as the court admitted it de'bene esse, it was an incident of the right of the court to determine the method in which the testimony should be educed; that is, the order of proof. While this right is a general one, it is not without exceptions, as may be inferred from Clark v. Fredericks, 105 U. S. 4, 5, 26 L. Ed. 938, where it is said that a judgment will not be reversed because of an error in directing the order of testimony, "unless it clearly appears that the complaining party has been injured by what was done." Moreover, we think there can be no question that there was such prejudicial result in the present case, although the error may not have been strictly an error of the court, in view of the assurance of counsel for the plaintiff which was not made good, yet it stands in the same condition as the improper statements of counsel to the jury in Waldron v. Waldron, supra; so that, although, strictly speaking, the court itself may not have committed an error, yet there was prejudicial error in the trial from which the defendant ought not to suffer.

It is, however, insisted that Cunningham's statement covered the question of the ownership of the team, and that that portion of the statement relating to liability slipped in in such a way as is common with witnesses who do not quite appreciate what is admissible and what is not admissible; so that it would be unjust to deprive the plaintiff of her verdict on account thereof, in view of the caution given by the court to the jury. But it did not slip in, because, as we have shown, the relations of the plaintiff with the witness were so intimate that she is presumed to have known all that her witness would testify to, and the question was put broadly, "What did he say to you," and thus in such a way as to bring out whatever was in the plaintiff's mind. Moreover, as we have shown, plaintiff's counsel was cautioned against so sweeping a question by the suggestion made by defendant's counsel that the witness might testify that Cunningham said: "We are liable for the whole thing. We are at fault."

Moreover, there was no issue as to that portion of Cunningham's alleged statement which related to the ownership of the team, which was "that it was Armour's team that done it." This did not mean that it was Armour's team that was left by some driver who went into the drinking saloon, if there was any such team or any such driver, for Cunningham knew nothing about that; but it did mean only that it was Armour's team which came into collision with the plaintiff. On this there was no controversy, because the bill of exceptions commences with a statement as follows:

"The defendant admits that its horse ran away on the date named, and that the wagon to which it was attached ran into, and collided with, the wagon in which Miss Skene was sitting, and threw her out upon the sidewalk; but denies any negligence on its part."

Apparently this is an agreed statement of the real issue, and the only issue, tried by the jury, and this apparent condition is fortified by the charge to the jury, in which the learned judge, in commenting on Cunningham's alleged statement, said that, "if he said what is alleged, it bears on the question only * * * whether it was their team, the defendant's team, which I understand them to have admitted." Moreover, in the long discussion with reference to the admission of the testi-

mony as to Cunningham's statement, there was no proposition or suggestion of any kind that the plaintiff offered it for the purpose of proving the identity of the colliding team, or had any need to use it therefor; and, subsequently, on the various motions of the defendant to strike out this testimony, there was no offer on the part of the plaintiff to limit it in any particular. There was, as we have already said, a question of the identity of the man who went into the drinking saloon, if any person went in there, and an examination of the witnesses which bore on this particular issue; but the record nowhere shows any question as to the identity of the team which collided with the plaintiff. On the other hand, what we have referred to leads to the just conclusion that there was no such issue. Therefore, in that respect, the error comes within the ruling of the court in Waldron v. Waldron, 156 U. S., already referred to, at page 384, of 156 U. S., at page 389 of 15 Sup. Ct. (39 L. Ed. 453), where it was said that it was true that the matter improperly put in by the counsel, which resulted in the new trial, related in one particular to a material issue; but, as that issue had been confessed by the pleadings, and was admitted in open court, it was wholly inadmissible. Under all the circumstances, it seems plain that this evidence was introduced for an improper purpose, and only for an improper purpose, so that the plaintiff should stand by the consequences of her act.

An exception was taken by the defendant to the admission of an ordinance of the city of Waltham imposing a penalty for allowing a horse to remain standing in the street, not in the care of some competent person, unless properly weighted or securely fastened. As we understand the case, this was admitted merely on the question of negligence, and, as we understand the common practice in Massachusetts, ordinances of that character are admissible in evidence for the purpose named.

Forty-three errors are assigned, covering nearly 19 printed pages. Many of them relate to opinions of nonexperts and to expressions of pain, all of which were admissible in evidence, within the rules shown by Insurance Company v. Rodel, 95 U. S. 232, 24 L. Ed. 433; Northern Railroad Company v. Urlin, 158 U. S. 271, 15 Sup. Ct. 840, 39 L. Ed. 977; O'Neil v. Hanscom, 175 Mass. 313, 56 N. E. 587; McCoy v. Jordan, 184 Mass. 575, 69 N. E. 358; and other cases of the same character, some of which are grouped in Chase's Stephen's Evidence (2d Ed.) 141, 142. The other errors assigned, to which we have not referred, were not brought to our attention in such manner as to demand our investigation of the record with reference to them. For example, one was that the court refused to direct a verdict for the defendant, as to which all said to us was merely that this brought up "the whole question of the defendant's negligence, and the plaintiff's freedom from contributory negligence," without anything further in reference to it. In like manner, eight assigned errors are disposed of in the defendant's brief by a mere reference to the fact that they were assigned, with a claim that the jury should have been fully and clearly instructed in regard to the subject-matters thereof. Of course, such treatment of alleged errors not only fails to meet the rules of this court, but also to conform to any practice which would require attention from any appellate tribunal. We think, however, that we have disposed of everything which is likely to arise on a new trial, or to which, for any reason,

it is necessary to give particular consideration. We have called attention to the different methods of alleging negligence in the several counts of the declaration. On account thereof the defendant moved before trial that the plaintiff elect between the counts, which motion was denied, and the defendant excepted. Clearly, according to the settled rules of practice, this, under the circumstances, was within the discretion of the Circuit Court, and forms no basis for an application to us.

On the whole, notwithstanding the numerous alleged errors which do not demand attention, the writer of this dissenting opinion is of the firm conviction, for the reasons herein stated, that, by refusing the defendant a new trial, great injustice is done it, and the rules of law, as settled and applied by the Supreme Court, are violated.

NOTE.—The following is the opinion of Hale, District Judge, on defendant's motion for a new trial:

HALE, District Judge. In this case the only question requiring a written opinion of the court is upon the motion to set aside the verdict because the damages were excessive. The plaintiff was a woman 65 years old at the time of the injury. The trial of the cause was some six years after the injury. The jury found for the plaintiff, and awarded damages in the sum of $10,000. When the verdict was rendered, I was of the opinion that the damages awarded by the jury were excessive, and that, in the exercise of a sound, judicial discretion, it would be the duty of the court to reduce the verdict or set it aside. After a very careful study of the case, I am still of the same opinion. I am, on the whole, of the belief that the jury must have been influenced by partiality during the conduct of the cause, and have rendered a rather larger verdict than the evidence fairly sustains. It is just, however, to say that, in my opinion, the evidence warrants a substantial verdict for the plaintiff. Neither the plaintiff nor her counsel attempted, during the trial, to arouse prejudice or passion against the defendant, or to inflame the jury's mind by any undue or unauthorized appeal to them. The plaintiff, at the time of the trial, was over 70 years old. She told her story in a simple, straightforward, and evidently truthful manner. The evidence justified a substantial award for doctors' bills, care, and nursing during the six years from the time of the injury until the time of the trial, and a very considerable sum for the plaintiff's personal suffering, both physical and mental. In reference to her suffering, the plaintiff did not undertake to exaggerate or to appeal to prejudice or sympathy. She showed that she had suffered severely during the several weeks when she lay in bed; that she had suffered ever since from weakness; and, for a considerable part of the time, from dizziness, nausea, bleeding from the nose, and from constant apprehension and fear of the recurrence of fainting and dizzy spells. The evidence of the plaintiff's physicians tends to show that the injuries are permanent in their nature, and tends also to show that she will suffer during the remainder of her life, although she was in good health before the injury. It is fair to say, too, that the medical testimony is not of an exaggerated character.

I could see, at the time of the trial, that the very simplicity and directness of the plaintiff's manner of giving her testimony, and of the testimony itself, had a great effect upon the jury, and would be likely to win from them a very large verdict. I therefore instructed the jury that, if they came to a question of damages, it was their duty to exercise great care in that branch of the case. I went so far in my charge as to say to them that, while juries should be just in the estimation of damages, they were not permitted to be generous, and that juries more often than otherwise were accustomed to err in the direction of unreasonably high verdicts.

There were some things in the conduct of the case, on the defendant's part, that might tend to influence the jury in the direction of high damages. As a matter of fact, they did render a verdict for larger damages, I think, than can be warranted by the evidence; but the plaintiff is clearly entitled to a verdict

for a very considerable sum. She is entitled to a reasonable amount for what she has paid her physicians, and for reasonable bills for nursing and attendance during the six years. The large element of damages, however, is for her suffering. The peculiarity of the plaintiff's case in this regard is that she has shown six years of actual suffering, part of the time of a severe character; for this she should have compensation. The testimony of her physicians tends also to show that she will have some suffering in future during the expectation of her life; and for this she should recover something.

The great question in the case is: How much should be allowed to the plaintiff for her six years of suffering? Upon this question there has been very extended argument by the learned counsel in the cause, who have cited a very great number of cases where the question of excessive damages has been considered by the courts. Two cases exactly alike cannot, however, be found in judicial literature; and the whole matter must come to a question of judicial discretion. It is undoubtedly my duty in this case not to grant a new trial unconditionally, but only in the event that the plaintiff shall not file a remittitur. If the question of allowing a remittitur were a new question, the objection might be raised that a court cannot order a remittitur, without invading the province of the jury, so that the result would be a verdict of the court, and not of the jury; but the practice of federal courts makes it clear that the court may correct a verdict of the jury in respect to excessive damages, and is not limited to granting an unconditional new trial. This court in this circuit has lately, and many times, had to pass upon this question. The Supreme Court has fully considered it. In Blunt v. Little, 3 Mason, 102, Fed. Cas. No. 1,578, Mr. Justice Story, while admititng that the exercise of the discretion of the court to disturb the verdict of the jury was full of delicacy and difficulty. recognized it to be a duty to interfere when it clearly appeared that the jury had given damages that were excessive. See Arkansas Cattle Co. v. Mann. 130 U. S. 69, 9 Sup. Ct. 458, 32 L. Ed. 854; Northern Pacific R. R. Co. v. Herbert, 116 U. S. 642, 646, 6 Sup. Ct. 590, 29 L. Ed. 755; Hansen v. Boyd, 161 U. S. 397, 16 Sup. Ct. 571, 40 L. Ed. 746; Daigneau v. Grand Trunk Ry. Co. (a recent opinion by Judge Brown) 153 Fed. 593.

While, in the exercise of a sound, judicial discretion, I cannot allow the verdict of $10,000 to stand, it is my duty to carefully review the testimony, and to allow plaintiff to retain as large a portion of this verdict as the evidence will, in my opinion, warrant. I am of the opinion that there is a reasonable basis in the testimony for a verdict of $6,500. If the verdict had been for that amount only, I should not have set it aside.

A new trial will be granted, upon the ground of excessive damages, unless. within 14 days, the plaintiff shall remit the sum of $3,500, and consent to judgment for the plaintiff for the sum of $6,500, and costs.